1      UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF TENNESSEE

3      NASHVILLE DIVISION

4

5  TOM HEMBY,                                    )
                                                 )
6                           PLAINTIFF, )
                                                 )
7          VS.                                   )    NO. 3:06-0979
                                                 )
8  BEBE WINANS aka BENJAMIN WINANS; and )
   HIDDEN BEACH RECORDINGS, LLC aka        )
9  HIDDEN BEACH RECORDS, LLC, aka          )
   HIDDEN BEACH RECORDINGS, LLC,           )
10                                               )
                           DEFENDANTS. )
11  _____)

12

        ** CONTAINS CONFIDENTIAL PORTIONS**

13

14

15          DEPOSITION OF STEVEN McKEEVER

16          SANTA MONICA, CALIFORNIA

17          MARCH 12, 2008

18

19

20

21

22

23  REPORTED BY:

24  CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR

25  JOB NO.: 15714

1

2

3

4

5         MARCH 12, 2008

6          9:30 A.M.

7

8

9   Deposition of Steven McKeever, taken on behalf of

10 Plaintiff, held at the offices of Dreier, Stein,

11 Kahan, Browne, Woods & George, 1620 26th Street,

12 Sixth Floor, Santa Monica, CA, before Christy A.

13 Cannariato, CSR #7954, RPR, CRR.

14

15

16

17

18

19

20

21

22

23

24

25

1          A P P E A R A N C E S

2

3

4

5    REPRESENTING THE PLAINTIFF:

6

7    CHESSER & ASSOCIATES, P.C.

8    BY:   JAMES P. CHESSER, ESQ.

9    P.O. BOX 50890

10   NASHVILLE, TN   37205

11   (615) 665-9299

12

13

14

15   REPRESENTING THE DEFENDANTS:

16

17   LYON & PHILLIPS, PLLC

18   BY:  BRUCE H. PHILLIPS, ESQ.

19   11 MUSIC CIRCLE SOUTH

20   SUITE 202

21   NASHVILLE, TN   37203

22   (615) 259-4664

23

24

25   ALSO PRESENT:   ALEXAN KESICBASIAN

1

# I N D E X

2

3

4 EXAMINATION BY                                                      PAGE

5 BY MR. CHESSER.......................................7

6

------------------------------------------------------------

7                                    EXHIBITS

8

EXHIBIT NO.    DESCRIPTION                                    PAGE

9

Exhibit 1
10 Plaintiff's Notice of Oral Deposition of
Defendant Hidden Beach......................................5

11

Exhibit 2
12 Plaintiff's Notice of Oral Deposition of Steven McKeever
President, Hidden Beach..................................5

13

Exhibit 3
14 Hidden Beach Recordings Office Manual...................81

15 Exhibit 4
Email from Roger Patton to McKeever 3/15/05
16 Subject:  Talking Points Bullet Points for BeBe
conversation..........................................114

17

Exhibit 5
18 Sony Distribution Agreement...........................121

19

20 ------------------------------------------------------------
                QUESTIONS INSTRUCTED NOT TO ANSWER

21
                             (NONE)

22

23

24

25

1          S. McKEEVER

2  Los Angeles, California, Wednesday, March 12, 2008; 9:30AM

3

4

5          MR. CHESSER:  I am James Chesser, Co-Counsel for the

6  plaintiff in this matter Tom Hemby.

7              We're here today pursuant to Plaintiff's

8  30(b)(6) motion Notice of Deposition of Hidden Beach, and

9  in particular Notice of Deposition of Mr. Steven McKeever,

10  President of Hidden Beach.

11              I'd like to mark as the first exhibits to this

12  deposition the Plaintiff's 30(b)(6) notice to Hidden

13  Beach, which we'll mark as Exhibit 1.

14              (Exhibit 1 marked for identification.)

15          MR. PHILLIPS:  That's fine.  I've seen it.

16          MR. CHESSER:  And then secondly I would like to mark

17  as Exhibit 2 Plaintiff's Notice of Deposition for Mr.

18  Steven McKeever.

19              (Exhibit 2 marked for identification.)

20          MR. CHESSER:  It's 9:30 a.m.  And we have been told

21  by Defendants' attorney, Mr. Bruce Phillips, that Hidden

22  Beach will do its best to endeavor to produce the Sony

23  distribution agreement with Hidden Beach and Sony Records,

24  Sony Music, that we had requested through a production of

25  documents request earlier and related to this deposition.

1          S. McKEEVER

2               So if that is not present today, if that's not

3     produced, if that's produced at a later time, then we may

4     need to reconvene this deposition to ask further questions

5     about that document.  And we'll be asking for those

6     expenses to be covered by Defendant.

7               Mr. Phillips advised me today that he is

8     representing both BeBe Winans and Hidden Beach.

9               And I don't know if you have anything to add

10    to that?

11         MR. PHILLIPS:  No, I don't have anything to add to

12    it.

13         MR. CHESSER:  All right.  Could we swear in the

14    witness, please.

15         THE WITNESS:  Now, can we go off the record in these

16    things or go back and forth?

17         MR. CHESSER:  Let's go off the record for just a

18    second.

19               (A discussion was held off the record.)

20         MR. CHESSER:  Let's go back on the record.

21               By way of completing my prefatory remarks, I

22    might also add that Plaintiff has requested copies of

23    Hidden Beach's policy manuals that were alluded to

24    yesterday by Roger Patton in preparation for this

25    deposition.

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 6 of 135 PageID #: 828

1          S. MCKEEVER

2          Counsel for Hidden Beach and I have a

3   difference of opinion as to whether or not those documents

4   had been requested in earlier prior production requests.

5   It's Plaintiff's position that they were assumed in the

6   request earlier under the paragraph 16 of our initial

7   document request.

8          Anyway, with those statements, if you have

9   anything further to add, I would like to swear in the

10  witness please, if you would.

11

12                  STEVEN McKEEVER,

13          having first been duly sworn, was

14          examined and testified as follows:

15

16                  EXAMINATION

17  BY MR. CHESSER:

18      Q.    Good morning, sir.  I'm James Chesser,

19  Co-Counsel in this matter.  And I represent Plaintiff Tom

20  Hemby.  I will be taking your deposition today.

21          Would you state for the record your full name,

22  your age, and your address, please.

23      A.    Steven Brent McKeever, 47 years old.  And my

24  home address or my --

25      Q.    Home address, please.

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 7 of 135 PageID #: 829

1          S. McKEEVER

2      A.     27092 Malibu Cove Colony Drive.

3      Q.     How many years have you lived at that address?

4      A.     13 years.

5      Q.     Are you, Mr. McKeever, a licensed attorney?

6      A.     Probably not anymore.  I was.  I passed the

7  bar, and I was -- I just sort of faded away from the

8  practice maybe 15 years ago.  I think I haven't seen -- I

9  don't know if my change of address gets sort of stuck when

10 I moved to this address.  I don't think I've seen a single

11 piece of Bar material.

12     Q.     As far as you know, you haven't paid license

13 fees for your law license?

14     A.     Oh, I haven't.  No.  I know I'm not in good

15 standing, if that's the case.

16     Q.     That's correct.  You're not in good standing.

17     A.     Meaning I'm pretty sure I did 10 years ago

18 what is it called -- more than 10 years ago -- where you

19 put apparently --

20     Q.     Suspension?

21     A.     Where I wanted to -- so I wouldn't have to be

22 paying dues every year.  So I haven't paid dues in ten

23 years easily.  I think more than that.  And I think I've

24 been suspended -- or not suspended I don't think is the

25 right word, but where you voluntarily say you're not

1                          S. McKEEVER

2      practice.

3           Q.      Inactive?

4           A.      Inactive.  That's the word I'm looking for.

5      I've been inactive for --

6           Q.      Never through censureship or through any

7      transgression?  You've never been censured by the Bar?

8           A.      Oh, no, no, no.

9           Q.      Well, I will review very briefly, Mr.

10     McKeever, some of the ground rules for the deposition

11     today so that we're both on the same page as to how we can

12     make this clear and efficient.

13                  You understand, I assume, that you will be

14     answering these questions today under oath; is that

15     correct?

16          A.      I understand that.

17          Q.      And that your testimony may be used in a

18     federal court proceeding presided over by a federal judge.

19          A.      Yes.

20          Q.      And to this purpose I assume you understand

21     that your answers to these questions should be as clear

22     and as illuminating as possible.  So if you do not

23     understand my question, it's imperative that you ask me to

24     repeat it.

25          A.      Okay.

S. MCKEEVER

Q.     I will rephrase it and do my very best to put
it into terms that you understand.

Now, also as you're probably aware, nods or
gestures don't translate well into the record.  The court
reporter cannot record these clearly.  So I will ask, if
you would, sir, that you please answer yes or no, if
relevant, followed by an explanation, if you feel that's
appropriate or else simply state the information I've
asked.

I don't expect you to guess at any of the
answers that I ask you today.  So if you don't know the
answer to a question, just state "I don't know."

A.     Okay.

Q.     And finally, I will ask as a matter of clarity
and of courtesy that you allow me to complete my question
before beginning your answer as I will endeavor to extend
the same courtesy to you.

Are all these ground rules clear?

A.     Yes.

Q.     Great.

Would you begin, Mr. McKeever, by telling me
if you have ever appeared in a deposition before.

A.     As I just mentioned, it was maybe 20 years ago
in connection with some very small piece of a contract I

1          S. MCKEEVER

2    may have been involved in.  I can't even remember when I

3    was at a law firm and something that came up a year later.

4    It was a very, very, very narrow -- oh, no, actually

5    twice.  I've been deposed twice.  That one time 20 years

6    ago.  And I was also deposed in connection with a

7    Universal Motown lawsuit when Universal -- when Motown was

8    trying to leave Universal.  So I have been deposed twice.

9          Q.    Were you a witness or a party to that action?

10         A.    I guess I was a witness.  I was definitely not

11   a party.  I was a witness.

12         Q.    Did you speak to anyone today about this

13   deposition or did you speak to anyone prior to today about

14   this deposition?

15         A.    No.

16         Q.    Other than your attorney, of course.

17         A.    No, I didn't even speak to him.

18         Q.    And did you review any documents in

19   preparation of your testimony today?

20         A.    No, I didn't.  I did talk to Roger yesterday

21   for about two minutes just because I thought I was going

22   to see him.  And I had the root canal.  I thought he was

23   having the deposition in my office.  So I said, oh, let's

24   hook up because we hadn't seen each other in awhile.  I

25   just asked him how did it go.  He just said well -- he was

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 11 of 135 PageID #: 833

1          S. McKEEVER

2    upset about how much time I guess he took.

3          But we didn't talk about any real substantive

4    issues.  I said, you know, I don't know much about this

5    whole situation.  And he's like, no, I don't think you --

6    just go in and tell what you can.  But I haven't talked to

7    anybody about this.

8          Q.    Have you been asked to undertake any future

9    work in preparation for this matter or this case?

10         A.    No.

11         Q.    Would you please state for the record your

12   current occupation and job title.

13         A.    I'm the President of -- we really don't have

14   formal titles for the most part at Hidden Beach.  But I'm

15   the President of the company, President and Founder of the

16   company is usually what you'll see in press or when we do

17   stuff of the Hidden Beach Recordings.  So I run the

18   company.

19         Q.    Are you an officer, then, of the company?

20         A.    Yes.

21         Q.    Have you, prior to Hidden Beach, worked for

22   other companies?

23         A.    Yes.

24         Q.    What are those companies you've worked for?

25         A.    Motown Records and --

1                          S. McKEEVER

2          Q.      When did you work for them?

3          A.      '91 to '95.

4          Q.      What did you do for them?

5          A.      I was the General Manager and Senior Vice

6     President of A&R.  And I think by the time I left I was --

7     title was Executive Vice President of Talent and Creative

8     Affairs.

9          Q.      And prior to that what did you do?

10         A.      I was head of West Coast Business Affairs for

11    Polygram Records.

12         Q.      And what years were they?

13         A.      That was '88 to '90, I guess.  End of '90.  I

14    think it was '88.  I'm pretty sure.  I'm trying to

15    remember when I started, if it was part of '87.  I'm

16    pretty sure it was '88.

17         Q.      You began work at Hidden Beach, I take it, on

18    the conception or the formation of Hidden Beach; is that

19    correct?

20         A.      Right.

21         Q.      What year was that?

22         A.      Depends on when you -- you know, I wrote the

23    -- conceptually I started really conceiving it in, you

24    know, probably at some point in '96.  I wrote the business

25    plan in '97, which, you know, became a full mission.  And

1                           S. McKEEVER

2    then I got funded in '98. So while I was working for it

3    and putting the company together for the year between '97

4    and '98, I wasn't earning salary or anything like that

5    until it was a funded company, sort of into '98. Depends

6    on at which point you use as a real start point.

7         Q.     Do you still have a copy of the business plan

8    for Hidden Beach?

9         A.     Yes.

10        MR. CHESSER: I would like, if I could, Mr. Phillips,

11    to ask you to request a copy of that to produce for

12    Plaintiff as a late-filed production request too, please.

13         Q.     Do you hold, Mr. McKeever, any other

14    employment for another company outside of Hidden Beach?

15         A.     No.

16         Q.     Are you on any outside boards for other

17    companies?

18         A.     Yes.

19         Q.     What other companies are you a board member

20    for?

21         A.     CollegeBound is a nonprofit educational. I'm

22    on the board of AfricanAncestry.com, which is a DNA

23    company. There's no remuneration or compensation at all

24    for that.

25         Q.     Are these California companies?

S. McKEEVER

1

2      A.      No.   The CollegeBound is California.

3    AfricanAncestry.com is a DC company.

4      Q.      Any other board roles?

5      A.      No.

6      Q.      Do you have any consulting roles?

7      A.      I was -- what?

8      Q.      I'm sorry, I will let you complete your

9    answer.

10     A.      No.   I don't think I am presently.   No.

11     Q.      No other board roles?

12     A.      Right.

13     Q.      Do you have any consulting roles for any other

14   companies?

15     A.      No.

16     Q.      Would you review your educational background

17   for me as well.   Summarize undergraduate through college.

18     A.      University of Illinois Champaign-Urbana (as

19   spoken) then Harvard Law School.

20     Q.      What did you study as an undergraduate?

21     A.      Entertainment PreLaw.

22     Q.      Then at Harvard you studied just general law

23   or did you take specialized courses?

24     A.      We did.   There was no specialty, really.   Your

25   degree -- I think international law from what I remember

S. McKEEVER

was probably one of the only sort of specialty that you
could do. My focus was entertainment, so I actually did
my third year at Berkeley. And my third year paper was
around, you know, to be close to California and to take
advantage of there was a program that Berkeley and Harvard
had which is an exchange program which let five students
from each school trade places. I did my third year paper
with, you know, about the negotiations. I did it all in,
you know, all focused on the entertainment business.

Q.     What was your paper on?

A.     On private law. It was actually the notion
that the entertainment business has very little case law
in issues; that cases -- this is ironic -- don't go to
trial. So there becomes a law that is known within the
industry of what the general parameters of what is, you
know, sort of fair and how things, you know, sort of get
decided.

And the cover of my paper, for example, had an
Lexis search on I think it was video. At the time I was
writing it, it was like '84, '85, music video was all the
rage with MTV. And there was obviously raised 10,000
questions as far as, you know, how things were being
handled. And no case law. And so the whole issues of
what I dealt with is how the industry decides what's fair.

Case 3:06-cv-00979     Document 106     Filed 07/16/09     Page 16 of 135 PageID #: 838

S. McKEEVER

1
2    And that's what's generally looked at a certain notion of
3    private law.  It's been 20-some years since I thought
4    about it, but that's what the paper was on.
5              So I interviewed 30 or so or more
6    entertainment attorneys here.  And people inside
7    companies, you know, how do you come to a decision about
8    royalties and produce -- especially when there's disputes.
9    And the general notion is that there's real strong, you
10   know, general parameters of this is the, you know, extreme
11   and this is the, you know, on both sides of the fence.
12        Q.    When did you graduate from law school?
13        A.    '85.
14        Q.    And then that's when you began work at your
15   first job; is that correct?
16        A.    Yes.  No, actually I started -- I actually got
17   the job in '84, '85, but I didn't start until January '86.
18        Q.    And who was that first firm?
19        A.    Irell & Manella.
20        Q.    And where were they?
21        A.    Century City.
22        Q.    Did you actually complete your degree at
23   Harvard or Berkeley?
24        A.    Harvard.  I was at Harvard when I was
25   physically on campus at Berkeley.

S. McKEEVER

2    Q.    I see.

3    A.    I mean, I finished -- it's a formal program.

4  It's part of the reason I went to Harvard, actually, is I

5  wanted to come to the West Coast.  But when I found out

6  about this program, I thought I could have my cake and eat

7  it too.  And it worked out exactly that way.

8    Q.    Did you have any other training besides law

9  school in entertainment law or entertainment policies

10 besides your training at law school?

11   A.    I mean --

12   Q.    And employment history, of course.

13   A.    Yeah, I lived it.  I mean, my whole from high

14 school on I mean was involved in some degree of the

15 business.  I was a musician.

16   Q.    What did you play?

17   A.    Keyboards.

18   Q.    In a band?

19   A.    In a band.

20   Q.    What was the band's name?  It wasn't a signed

21 band, was it?

22   A.    No, it wasn't a signed band.  It was TC and

23 Friends.  We've had a bunch of names.  And played with

24 some different bands as well.

25   Q.    That's what got you interested in

S. McKEEVER

2   entertainment?

3       A.      Yeah.   I was always interested.  So it was

4   inception I think, conception.

5       Q.      Are you a stockholder or member of Hidden

6   Beach currently?

7       A.      I'm a member, yes.

8       Q.      A member.  And do you know whether or not the

9   membership is divided in terms of membership for

10  governance versus membership for finance?  Do you know

11  that distinction?

12      A.      No.

13      Q.      What is your percentage interest in Hidden

14  Beach?

15      A.      35%.

16      Q.      And who are some of the other members of

17  Hidden Beach that are owners of the company with you?

18      A.      There's Lou Weisbach, Tom Herskovitz.

19      Q.      Identify the city or the rough locations where

20  these people are.

21      A.      Lou Weisbach is Illinois.

22      Q.      What does he do?

23      A.      Entrepreneur.  Tom Herskovitz.

24      Q.      How many -- by the way, how much does Lou own?

25      A.      All of this information is extremely

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 19 of 135 PageID #: 841

S. McKEEVER

1

2  confidential.  So I don't know --

3      Q.    I understand.  Your attorney and I will

4  discuss this and work out the details of how that can be

5  treated.

6      MR. PHILLIPS:  For purposes, James, I think, of going

7  forward, parts of this deposition can be designated as

8  confidential and subject to the protective order.  And

9  that's pretty common.  I think we ought to be able to

10  agree on that.  And we can just designate what part of the

11  deposition is confidential.

12      MR. CHESSER:  Yeah.  I don't have any difficulty with

13  that.  The only stipulation that we have as plaintiffs is

14  that we cannot be tied from using that in the trial

15  itself.

16      MR. PHILLIPS:  I don't believe that the court would

17  allow us to do that.

18      MR. CHESSER:  Right.  I understand.  So if that's the

19  case, we're not stipulating for the purposes of trial that

20  this information will also be confidential.  That's all.

21      MR. PHILLIPS:  Well, I don't believe the protective

22  order will provide for that.

23      MR. CHESSER:  Then we're in agreement, then.

24      MR. PHILLIPS:  As a practical matter, we'll designate

25  sections or pages 20 through 28 of the deposition

S. McKEEVER

1

2    transcript to Steve McKeever as subject to the protective

3    order.

4        MR. CHESSER:  I'm in agreement with that as far as --

5    as far as it relates to the ownership of Hidden Beach for

6    purposes of this deposition now, but for that limited

7    purpose.

8        Q.    Would you continue with addressing the names

9    of the other members of Hidden Beach and their percentage

10   interests.

11       A.    Alex may be able to give you precise

12   percentages.  But Tom Herskovitz, Lou Weisbach --

13       Q.    Tom is in L.A., you said?

14       A.    Tom Herskovitz I think moved to Ohio.

15       Q.    And he's an entrepreneur also?

16       A.    Yes.

17       Q.    What is his interest?

18       A.    It's like 2%, I think.  Around 2%.  Weisbach

19   around 2%.

20       Q.    And he's --

21       A.    My dad is about -- Lester McKeever -- about

22   2%.

23       Q.    He's in L.A. also your father?

24       A.    No, he's in Chicago.

25             George Hiltzik in New York.  Larry Miller.

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 21 of 135 PageID #: 843

1          S. McKEEVER

2     Q.     What's his interest, George?

3     A.     About 3%.  He had a split with a guy named --

4     gentleman named Robert Streidler, who has recently passed

5     away.  And so they split I think around 3%.  I think it

6     was around 3-something-percent, 3.something percent

7     interest.

8            Steve Singer in New Jersey, 15%.

9     Q.     What does he do?

10    A.     He's an entrepreneur, but he invests in

11    several companies.

12           Sandy Cove, which is an LLC formed to invest

13    in the company, is about 30% interest.

14    Q.     And what does this person do?

15    A.     There's been a -- I don't even know who owns

16    Sandy Cove now because there was a divorce between the

17    principals in that.

18    Q.     Sandy Cove is company?

19    A.     Yeah.

20    Q.     Named Sandy Cove.  I thought it was a person.

21    A.     No, it's an LLC.

22    Q.     And that owns 30%?

23    A.     Right.

24    Q.     And who controls Sandy Cove?  You don't know?

25    A.     I don't even know now.

1                              S. McKEEVER

2          Q.      Is it a California LLC?

3          A.      I think it's an Illinois LLC.

4          Q.      Where does it do business?  Where is its

5     offices?

6          A.      I now send notices to it to DC.

7          Q.      So they have an office in DC?

8          A.      Office in DC.

9          Q.      What is their line of work?

10         A.      It was formed I think simply for the purposes

11    of investing in this company.

12         Q.      I see.  And do you know who some of the

13    members are of that?

14         A.      I have never seen their incorporation papers

15    or anything like that.  But it was Michael Jordan was --

16         Q.      The basketball player?

17         A.      Basketball player, right, former basketball

18    player.  And I assumed his wife, who was also very

19    involved, but they've since been divorced.  So I don't

20    know if in the divorce if this was something that Juanita

21    Jordan holds or Michael Jordan.

22         Q.      I understand.  Any other members that you can

23    think of or are you aware of that --

24         A.      Andy Dennen.

25         Q.      Where does Mr. Dennen --

1                          S. McKEEVER

2        A.      He's in Michigan.

3        Q.      What does he do?

4        A.      He's the president of -- he's an entrepreneur

5   but president of a steel mill.

6        Q.      What is his interest?

7        A.      3%, I think.  3.something, .59 or whatever.

8   I'm not sure what the percentage is.

9        Q.      Are there any other members that come to mind?

10       A.      I think that's it.

11       Q.      Were all these people known to you prior to

12   the formation of Hidden Beach?

13       A.      No.

14       Q.      So some of these people became members after

15   the formation?

16       A.      Oh, no.  At the moment of formation, yes.  In

17   the process.  I met some of them in connection with it.

18       Q.      I see.  They weren't necessarily friends or

19   acquaintances of yours prior to Hidden Beach?

20       A.      No.

21       Q.      But they were all involved in the formation of

22   Hidden Beach; is that correct?

23       A.      Right.

24       Q.      Are there any disputes that you know of

25   between these members regarding the operation of Hidden

1                          S. McKEEVER

2     Beach?

3          A.     Not that I know of.

4          Q.     There's no claims being made by the members

5     against Hidden Beach, are there?

6          A.     No, not that I know of.

7          Q.     And as far as you're aware, there is no

8     ongoing litigation against Hidden Beach other than the

9     present matter right now that we're talking about.

10         A.     Yeah, I don't even consider this against

11    Hidden Beach.

12         Q.     I understand.

13         A.     But no.

14         Q.     But as far as you know, there's no other

15    litigation that Hidden Beach is subject to or a party --

16         A.     No.

17         Q.     -- in.  All right.

18                The company is it an LLC Hidden Beach?

19         A.     It's an LLC.

20         Q.     What's its full legal name?

21         A.     Hidden Beach.  It's supposed to be Beach

22    Recordings, but it was a typo done when it was filed.  So

23    legally I think it's Hidden Beach Records.

24         Q.     LLC?

25         A.     LLC.

1                    S. McKEEVER

2        Q.      And Incorporated or --

3        A.      In California.

4        Q.      In California.  The nature of the business as

5    stated in its charter?

6        A.      I don't know.

7        Q.      Well, what's your intent as far as the nature

8    of the business for Hidden Beach?

9        A.      It was an entertainment company.

10       Q.      Exclusively?  Releasing of -- when you say

11   entertainment company, could you specify?

12       A.      Making records.  Making, you know, recordings.

13       Q.      Do you make videos as well?

14       A.      Yes.

15       Q.      Publish books?

16       A.      Not yet.  We haven't done that.

17       Q.      Do you have any other entertainment interests

18   besides film records?  You're not involved in movies for

19   instance, are you?

20       A.      Not as -- we have not -- none that we've

21   released so far.

22       Q.      So pretty much is the mission of Hidden Beach

23   based on the marketing and sale of records and videos?  Is

24   that a fair statement?

25       A.      Yes.  I mean, there's broader missions that we

1                           S. McKEEVER

2    have.

3         Q.     But that's its general line of business?

4         A.     Yeah, because we have -- yeah, we have for

5    example an internship program.  We are fairly, as I set it

6    out to be a company, I don't think -- that's why we've

7    never been involved in any lawsuits.  I mean, you know, my

8    whole goal was to start this company to fulfill a lot of

9    the dream what I thought how companies should operate when

10   I was a kid growing up in Chicago.  And I think we've

11   maintained that.  And so we do a lot of community work.

12   We do a lot of work with kids.  We have an internship

13   program.  So there's while there may not be a financial

14   bottom line mission, there's been, you know, constant just

15   with the type of the quality of the music that we put out

16   and the messages there's been, you know, sort of several

17   lines that we've done in that respect as well.

18        Q.     I believe I read an e-mail of yours sometime

19   ago that stated that Hidden Beach's vision was, or words

20   to this effect, capture pure emotion --

21        A.     Mmh-hmm.

22        Q.     -- in recording.  Is that a fair statement?

23        A.     Yeah.  That's true.

24        Q.     And have you ever changed your name Hidden

25   Beach?  Has it always been Hidden Beach?

1    S. McKEEVER

2    A.    Yes.

3    Q.    And have you ever merged with another company

4    or have you been a subsidiary of another company?

5    A.    No.  No.

6    Q.    Do you yourself own any other companies?

7    Hidden Beach, rather, does it own any other companies?

8    A.    Yes.  I mean, we own -- I don't know if we've

9    formally incorporated them.  We have other label brands,

10   which is Still Waters, which is inspirational.

11   Q.    Are these -- excuse me.  Are these the visions

12   of the company or --

13   A.    I don't know what the formal legal title, but

14   you know, we've created and trademarked other brands to

15   release product.  Hidden Beach Forum is one.  Celebration

16   Series is just another brand that we've put out.  It would

17   be a division.  And so I think those are the --

18   Q.    There is no holding company for Hidden Beach,

19   is there?  I mean, you're not yourself -- your proceeds

20   don't go to another company, do they?

21   A.    No.

22   Q.    Now, I recall looking at a document published

23   by the California Secretary of State that listed Hidden

24   Beach's address for service of process as 23852 Pacific

25   Coast Highway.

S. McKEEVER

2          A.      Mmh-hmm.

3          Q.      Where is that address?

4          A.      It's a mailbox in Malibu.  When I started the
5    company I was working out of my house, and I used a
6    mailbox as my -- you know, for a bunch of reasons.  It was
7    a business center, basically.  And I didn't want to give
8    my home address to be listed.  It's a mailbox pretty close
9    to my house.

10          Q.      Is it still active?

11          A.      No.

12          Q.      Have you changed your address as far as you
13    know for service of process?

14          A.      It should be 3030 Nebraska, you know, our
15    business address.

16          Q.      Your physical business address?

17          A.      Yeah.

18          Q.      What would you describe as the major assets of
19    Hidden Beach?

20          A.      Our recordings, I guess.

21          Q.      Which are contracts also?

22          A.      Contracts, yeah.  Artist contracts.

23          Q.      Intellectual property or trademarks, would
24    they be major assets?

25          A.      Yes.

S. McKEEVER

1

2      Q.    Anything else?  Any physical assets?

3      A.    Not much.  I mean major, no.  I mean,

4    obviously physical record --

5      Q.    Do you know do you own the building, for

6    instance?

7      A.    No.

8      Q.    Do you have any major liabilities?

9      A.    Yes.  I mean, financial liabilities, yes.

10      Q.    What would some of those the major ones be?

11      A.    Major ones be our debt to Universal and then,

12    you know --

13      Q.    What is that for the debt to Universal?

14      A.    Advances given to us from Universal.

15      Q.    Are they your present distributor?

16      A.    Yes.

17      Q.    And do you have any other debts owing to other

18    distributors?

19      A.    Yes, Sony Records.

20      Q.    How much do you owe to Sony Records?

21      A.    I don't know.  I think it's -- I think it's

22    probably about -- it's between 100 and 200 thousand.

23      Q.    Is this a recoupable advance that is

24    returnable against or payable against income or is it

25    actually just a hard debt that you owe on a promissory

1                          S. McKEEVER

2    note or something of that --

3         A.     It was -- I think right now it's owed on

4    general -- on percentages from sales that have been made.

5         Q.     So it's an advance basically that's payable

6    back?

7         A.     I don't know if it's an advance.  I think it's

8    just the royalty on existing products that we have, you

9    know, you know, a current obligation to pay.

10        Q.     I see.  So as far as you understand, it's a

11   debt that at any time they could demand payment for?

12        A.     Yes.  I think Alex can give you the details,

13   but I think it's -- there's a date where it will come due

14   and it's -- you know, I'm not sure if it's something that

15   has to be staggered or paid over time.

16        Q.     The Universal debt, how much is that roughly?

17        A.     I think it's around 400, 300 or 400 thousand

18   dollars.

19        Q.     And again, is that an actual liability or is

20   it an advance that has to be --

21        A.     It's an advance that has to be paid back.

22        Q.     In other words, if the proceeds aren't

23   generated to pay the money back, you wouldn't owe

24   Universal any money; is that correct?

25        A.     Again, this is sort of the issue of private

S. McKEEVER

1

2    law.

3        MR. PHILLIPS:  Oh, excuse me.  I thought you said it

4    was an issue of confidentiality.  This is the type of

5    testimony that we probably would mark after the deposition

6    as being confidential.

7        MR. CHESSER:  Right.

8        THE WITNESS:  All of this, I would suspect.  In fact,

9    the percentages that we talked about.

10       MR. PHILLIPS:  Exactly.  All of that.

11       THE WITNESS:  All of that.

12       MR. PHILLIPS:  I understand.  We'll take care of that

13   later.

14       Q.    My question --

15       A.    I think if you read the -- if on paper I think

16   we have an obligation to pay it back.  And there's liens

17   and things like that against the company to do so and for

18   them to be able to do it.  I think as a practical matter,

19   how things work in the business, that I don't know of

20   situations where somebody -- if a company -- if something

21   falls apart and goes belly up that the companies like

22   Universal have gone after the principal personally to, you

23   know, pay back that money.  It's usually understood that

24   this is supposed to be paid back from the earnings that

25   have been generated by the content that's been created.

1          S. McKEEVER

2          Q.     But as far as you're aware, the paperwork

3     states that this is an actual liability that has to be

4     paid back; is that correct?

5          A.     Yes.

6          Q.     And your CFO would have further information

7     about this; is that correct?

8          A.     He may be able to give you -- I mean, that's

9     what he studies, so he may be able to give you more

10    detail.

11         Q.     Did you negotiate these distributors deals

12    with Sony and Universal?

13         A.     Yes.

14         Q.     So you approached them or did they approach

15    you?

16         A.     Both.  I mean, it was -- you know, it's a

17    small business.  I knew people in both places, and, you

18    know, made -- I had more than -- I had more -- I had

19    opportunities on both every time we've done distribution,

20    because, you know, I think on your reputation, sort of

21    track record in the business.  So --

22         Q.     I understand.  Did you have any other major

23    debts besides the Universal and Sony debts that you spoke

24    of?

25         A.     There may be some copyright royalty debts.

1                          S. McKEEVER

2        Q.     To whom?

3        A.     To like Harry Fox Agency.

4        Q.     Any idea of the amount of those debts?

5        A.     I don't know the exact.  I know we're working

6    with Harry Fox now.

7        Q.     Like under 100,000?

8        A.     No, I think it's over 100,000.

9        Q.     Under a million?

10       A.     I think under a million.

11       Q.     And what's the most recent tax year that you

12   filed for your --

13       A.     LLC doesn't file taxes.

14       Q.     Well, then paying your franchise tax.  When

15   was that last paid?

16       A.     By my guess it would be, if taxes are coming

17   up due now, I would guess it would be 2006.

18       Q.     So you believe that franchise tax for 2006 has

19   been paid?

20       A.     If -- I don't remember -- I know we pay some

21   state -- like we have taxes that we have to deal with for

22   City of Santa Monica.  But again, I'm not -- you would

23   have to ask our accountants about that.

24       Q.     Who would have that information?

25       A.     Alex would have that.

S. McKEEVER

1

2      Q.      Alex?

3      A.      Kesicbasian.

4      Q.      Where are the records kept that relate to

5  franchise tax or state obligations?

6      A.      Either in our -- I think our tax work is done

7  by a private financial business management firm in Santa

8  Monica and Alex.  So between his office and the business

9  manager's office.

10      Q.      I understand.  Thank you.

11              Now, currently how many employees work at

12  Hidden Beach?

13      A.      I think it's -- I just learned this yesterday

14  -- technical employees I think it's four.

15      Q.      Has that number gone up or down over the past

16  year --

17      A.      Down.

18      Q.      -- or is it pretty stable?

19      A.      No, it's down.

20      Q.      What were the number of employees at Hidden

21  Beach, say, five years ago?

22      A.      May have been six or as high as six or seven.

23      Q.      How many contractors does Hidden Beach use or

24  consultants do they use in their course of work?

25      A.      Anywhere between, I think, four and seven and

1                          S. McKEEVER

2      eight, you know, at a given time.

3          Q.      These are actual people that you contract with

4      to provide services?

5          A.      Right.

6          Q.      What type of services do these people provide?

7          A.      Things like publicity services, international

8      liaison, you know, services, video promotion.

9          Q.      Can you name a few of these people that you

10     have contracted with that provide services?

11         A.      Vivian Hsu is our -- has done our

12     international work. She represents several companies.

13     But she represents us internationally as liaison between

14     all of our foreign distributors and the company.

15         Q.      Is she in L.A.?

16         A.      She's in New Jersey.

17         Q.      Who else?

18         A.      Diane Blanchese has done work with us with

19     taking videos to the video channels and being a liaison

20     between video channels.

21         Q.      And where does she reside?

22         A.      New York.

23                 We've got Fred Mackenzie, who is a sales

24     consultant. He's based in Atlanta.

25         Q.      What does he do?

1               S. McKEEVER

2       A.      He's our sale -- he's our liaison -- he's like

3    a sales rep for the company.  But then like other people

4    he represents other, you know, companies.  But he's, you

5    know, he represents -- so he deals with Universal and

6    helps deal with separate accounts.

7       Q.      Any other contractors that come to mind or

8    consultants?

9       A.      No, not off the top of my head.

10      Q.      I believe you said earlier that the company

11   doesn't have officers per se; is that correct?

12      A.      Yes.

13      Q.      But who are some of the major role players in

14   the Hidden Beach organization as far as employees go?

15      A.      That's unfortunately dwindled quite a bit in

16   the recent time.

17      Q.      Before you answer that question, and if you

18   say it's dwindled, I'd like to get a sense of the overall

19   state of things.  Would you say that Hidden Beach's

20   revenues over the past five years have dwindled also?

21      A.      Yes.

22      Q.      Can you give me an idea of how much that

23   change has been?

24      A.      I think it is pretty consistent with the

25   overall industry.  I mean, the business has gone down, you

1                        S. McKEEVER

2   know, if you sort of SoundScan, you know, the traditional

3   business has been a pretty precipitous drop in just actual

4   CD sales.

5        Q.    Well, for instance, Hidden Beach was formed

6   you said approximately ten years ago; is that correct?

7        A.    Mmh-hmm.

8        Q.    Over that ten years how much fluctuation has

9   there been in, say, gross revenues?

10       A.    Tremendous amount.  I mean, it depends --

11  there's just a tremendous -- even in really strong times

12  there's a big fluctuation.

13       Q.    In terms --

14       A.    In gross -- because of what you may put out in

15  a given year.

16       Q.    What's the range that we're talking about

17  here?

18       A.    Anywhere from 10,000,000 to negative 3.

19       Q.    Annually gross --

20       A.    Negative 2.

21       Q.    -- revenues?

22       A.    Yeah.

23       Q.    And I take it, then, that as we get closer to

24  the present and look at Hidden Beach's gross revenues they

25  diminished?

S. McKEEVER

A.    Yes.  We also had a -- I believe we're coming

out of a very debilitating experience that happened to the

company that I think has less to do with the general

market conditions.  But our end of our relationship with

Sony was quite detrimental to the company.

Q.    Was that an acrimonious termination?

A.    I don't know if -- I mean, I was able to sit

down with the powers that be.  So there was never any

screaming or anything.  But it was a merger that happened

with Sony BMG in change in policies and their general

troubles, because there's a very tough time inside Sony

BMG, trickled down and hit us really, really hard.

Q.    Do you have any outstanding claims against

Sony?

A.    No, we ended up settling to leave.

Q.    What were the terms of that settlement?

A.    That we were able to leave.  And we had some

extending obligations.  I think they still are like

managing ringtones and some other aspects of our business.

But it was, you know, it was very, very, very tough on us

as a company.  And as a result, the year of leaving and --

there was mostly a year we didn't put out any records.

Q.    When was that year of termination?

A.    I think end of 2005 to 2006.  We started our

S. McKEEVER

new arrangement with Universal in 2006.

Q. I see. You were telling me about the duties
of the key players at Hidden Beach. Would you kindly
continue with that summary of what the major employees or
the employees at Hidden Beach do.

A. Alex, who is actually a consultant, you know,
a formal consultant to the company.

Q. He's not an employee?

A. No.

Q. Has he ever been an employee?

A. Yes.

Q. When did he cease being an employee?

A. 2000 -- he took another job for a while at a
real estate company. I think it was 2006. I'm not sure.

Q. And prior to that he was with the company at
start up, was he?

A. No. He was there from maybe -- either 2004 or
2005. I can't remember.

Q. And he started though as an employee?

A. Yes.

Q. All right. And he is your CFO or your chief
financial person?

A. Right.

Q. And who else are the players in Hidden Beach?

1                        S. McKEEVER

2        A.      We've got an A&R person named Jerrold

3    Thompson.  We have my assistant.  I've got a fellow named

4    Charles Whitfield.

5        Q.      Your assistant?

6        A.      No, my assistant is Nina Turner.

7        Q.      What does she do?

8        A.      She does, you know, everything that is

9    consistent with somebody, you know, being an assistant

10    from answering phones to scheduling meetings to, you know,

11    sort of a whole -- a big job.

12        Q.      I understand.  And who else again?

13        A.      Charles Whitfield was there from day 1.

14        Q.      What does he do?

15        A.      He's right now starting to focus on digital

16    distribution.  He helps with the internship program.  He

17    helps or facilitate projects going in the door and coming

18    out.

19        Q.      Do these people actually have titles?

20        A.      No.

21        Q.      And anybody else?

22        A.      There's a gentleman named Thornell Jones who

23    was employed I think -- no, maybe it was -- he's now a

24    marketing consultant and does marketing, you know, for

25    projects, helps sort of oversee some marketing and

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 41 of 135 PageID #: 863

1                           S. McKEEVER

2      projects.

3           Q.      At the time --

4           A.      And Bruce Rucker is a receptionist.

5           Q.      Right.  And do you know of the name Jill

6      Piano?

7           A.      Oh, yeah.

8           Q.      What does she do?

9           A.      Jill was Roger's assistant.

10          Q.      Was she an employee of the company?

11          A.      I don't remember if she -- because she -- it

12     was, you know, interesting how Roger even came to work

13     with Hidden Beach.  And she worked with him, and I think

14     he had a separate law practice going on.  But I think she

15     was actually, I think in the end, was an employee.

16          Q.      Are there any other employees that have ceased

17     working for the company but were employees at the time,

18     say, the subject albums of this case, Dream and My

19     Christmas Prayer, were released?  Any other employees with

20     Hidden Beach that you haven't already named?

21          A.      Well, there's Jill.  I had a different

22     assistant at that time.  And we had a much bigger staff,

23     too.  So I think I'm trying to think who else was there.

24          Q.      If you're not familiar with that information,

25     that's fine.  Who would know that information?

1          S. McKEEVER

2          A.      Alex would be able to I think at least have a

3     better -- you know, at least hands on, like to look at if

4     the -- I don't remember what year.  I think it was even

5     2004 that -- was it Christmas 2004 the Christmas record

6     came out?  I'm trying to -- he would be able to just find

7     something that say, oh, here is who was on board at

8     Christmas of 2004.

9          Q.      Mr. McKeever, as President of the company, I

10    take it you don't report to anybody else, do you?

11         A.      No.

12         Q.      You don't answer to anybody else for your

13    work?  You're not accountable to any boss?  You're head of

14    the company; correct?

15         A.      Yeah.  I mean, our investors I'm accountable

16    to.

17         Q.      Yes.  But as far as other employees of the

18    company, --

19         A.      No.

20         Q.      -- you are No. 1.

21         A.      Right.

22         Q.      Are you overall in charge of what happens to

23    Hidden Beach, its operations and policies?

24         A.      Yeah, yeah.  Obviously.  Eventually.

25         Q.      So ultimately are you the man responsible for

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 43 of 135 PageID #: 865

1                           S. McKEEVER

2    Hidden Beach's policies?

3        A.    Yes.  I mean, I think I set you know -- and it

4    took a degree of time in sort of setting a basic, you

5    know, out -- or principles that the policies of how we

6    operate are dealt with, you know, sort of from that point.

7    I mean, you --

8        Q.    It's your business plan for Hidden Beach, not

9    anyone else's; correct?  You wrote the business plan?

10       A.    I wrote the business plan.

11       Q.    And you oversee ultimately what happens at the

12   company; is that correct?

13       A.    Right.  I mean, you know, just like in any,

14   you know, endeavor.  For example, Roger was at the

15   company.  Roger has understood the company implicitly and

16   it sort of almost became part of his DNA.  And he

17   really --

18       Q.    He reported to you, though; correct?

19       A.    He reported to me.  Right.  So ultimately.

20   But I'm just saying --

21       Q.    You farmed out?

22       A.    Yeah, just like you delegate --

23       Q.    Of course.

24       A.    -- most of sort of the policy and sort of

25   business operation.  I had so much trust in Roger.

S. McKEEVER

1
2    There's actually been a major, you know, you know, major

3    hole, I guess, to some degree with him, because he really

4    handles so, you know, detail.  Where very little of this

5    stuff I saw or dealt with, you know, especially because

6    his legal background as well from dealing with the, you

7    know, attorneys.  Like this whole issue, as Bruce could

8    tell you, just fairly recently has come to light to me

9    that this was even, you know --

10        Q.    On a day-to-day basis, perhaps you could

11   describe the things that you would do for the company as

12   president.

13        A.    Talking to artists.  Helping making records.

14   You know, I mean, just you can hear and see it's a pretty

15   small shop.  I get involved in obviously the big picture

16   of a lot of what are we going to do this year and every

17   aspect.  And like a major release, like a Jill Scott

18   release album, you know, when is it going to come out,

19   when is the release date, when is the single going to be,

20   who are the video directors that we're going to use, what

21   is the sort of spin on the marketing of themes, campaigns,

22   things like that.

23        Q.    You don't actually do these things yourself.

24   You have employees to do that for you, though; is that

25   correct?

1                          S. McKEEVER

2          A.      What do you mean don't do them myself?

3          Q.      Well, you don't actually do the marketing

4     yourself.  Your role is, if -- now, you correct me if I'm

5     wrong -- but your role is to he oversee that these things

6     happen?

7          A.      Yeah.  I mean, I do -- but I do many things

8     myself as well.  I mean --

9          Q.      Such as what would you do?

10         A.      Like I write a liner note, for example, which

11    will set a tone for this is the story behind this record.

12    And I don't farm that out.  I actually, I think, on every

13    album I've probably written some, you know, notes which is

14    sort of -- and will sit and may lead a discussion, This is

15    why this record is important, This is why we've signed it,

16    This is what this artist is about.  And you know --

17         Q.      Excuse me.  Did you write liner notes for the

18    My Christmas Prayer or the Dream albums?

19         A.      I'm pretty sure I did it for Dream.  On

20    Christmas Prayer I don't think -- I think it was one of

21    the exceptions that we didn't do a liner.  I didn't do --

22    I think it was one of the very few -- I could be mistaken,

23    but I don't remember doing it for that one.

24         Q.      As part of your day-to-day duties, I take it

25    that management of other employees is a key

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 46 of 135 PageID #: 868

1                     S. McKEEVER

2    responsibility, too.  You oversee other employees at your

3    company --

4         A.    Right.

5         Q.    -- that they're doing their job?

6         A.    Right.

7         Q.    And that the policies are being properly

8    implemented?

9         A.    Yes, I mean --

10        Q.    They answer to you, correct?

11        A.    Yes.

12        Q.    And so you check up on how they're doing and

13   what they're doing; is that correct?

14        A.    Yes.  I mean, I guess, you know, to the extent

15   -- I mean -- you know, we're a small company, and we're

16   actually just in the process now of, you know, trying to

17   greater formalize that process.  Like many small

18   companies, everyone is set into a single room when we

19   started the company.  So the needs for a lot of checks and

20   balances were not there when there were two people.  I

21   could look at and see everything they were doing.

22        Q.    You could talk to them anytime?

23        A.    Anytime.

24        Q.    Small office.

25        A.    Yeah.  I mean, it was a quarter of the size or

1    S. McKEEVER
2    half the size of this conference room that we're in. As
3    it's grown, as the company grew, I won't say we had -- we
4    didn't necessarily put in place -- I think we had the best
5    intentions to put in place. But we learned a lot of
6    things the hard way that you need some degree of checks
7    and balances and, you know, more formality to be able to
8    do a better job. So I can't say I've always done, you
9    know, the pristine job of -- you know, because I've also
10   been so hands on in a lot of creative areas. And
11   otherwise, that, you know, just taking a real sort of
12   managerial role, you know, all the way down the food chain
13   has not been the case.
14        Q.      I want to make sure I understand your last
15   remark. In other words, are you saying that you do or do
16   not oversee the other employees that work for the company?
17        A.      Ultimately it's me that oversees them.
18        Q.      Right. And there are certain functions you've
19   talked about at the company that are farmed out, some of
20   your contractors and consultants. Would you tell me who
21   actually manufactures the records for the company when
22   they're released?
23        A.      Universal right now.
24        Q.      Or distribution. Or Sony prior to that.
25   Would that be correct?

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 48 of 135 PageID #: 870

S. McKEEVER

A.    Prior to that.  Right.

Q.    Would they actually have copies of inventory

records of manufacturing?

A.    They should.

Q.    Do you have those copies of inventory records,

too?

A.    I don't know.  I don't know if we ever did,

actually.  I mean, they would provide a statement that

said this is what we -- you know, in fact, you know, Sony

constantly gave us manufacturing records less than what

was SoundScanned.

Q.    Did you audit Sony?

A.    We have.  We were going to do it I think

again, and we ended up not doing it.

Q.    Did you audit them at the time that you were

releasing Christmas Prayer --

A.    It was before that.  It was a few years before

that.

Q.    So you've never audited Sony in connection

with Dream or My Christmas Prayer?

A.    No.

Q.    During the audit was there a discrepancy?

A.    Oh, yeah, there were several that we

discovered.

1          S. McKEEVER

2     Q.     How much are we talking about discrepancy?

3     10, 20%?  Give me a range.

4     A.     I don't know the percentage.  I think there

5     was one discrepancy we found that was $400,000 and

6     something that they thought had been paid out that hadn't

7     been paid out.

8     Q.     And was it just a mistake or --

9     A.     They --

10    Q.     -- have some other way of accounting that you

11    didn't agree with?

12    A.     No, I think that they when our auditor raised

13    it they left the room, left him sitting there for a few

14    hours and came back and said, oh, our official story is

15    that we mailed you the check and you didn't get it, and

16    here is a check.

17    Q.     Do you have a copy of that audit report?

18    A.     I don't know if there was ever a report

19    generated.

20    Q.     Who actually did the audit?

21    A.     Fred Moultrie.

22    Q.     What year?

23    A.     2002, maybe 2003 or something like that.

24    Beginning of 2002 probably.

25    Q.     The name is Fred Multrain?

1                           S. McKEEVER

2          A.      Moultrie.

3          Q.      Moultrie.  And is he a CPA?

4          A.      Yes.

5          Q.      He is not an employee of Hidden Beach?

6          A.      No.

7          Q.      You contracted him for his services?

8          A.      Yes.

9          Q.      Other than what we've talked about in

10   manufacturing, and with consultants, are there any other

11   services or functions of the company that you contract

12   out?

13         A.      I think accounting, legal services.  Off the

14   top of my head, that's all I can think of.

15         Q.      That's fine.  Would you care to take -- off

16   the record for a second.

17                 (A discussion was held off the record.)

18                 (Recess.)

19         Q.      Mr. McKeever, before we took a break you were

20   stating that in summary Hidden Beach's business is to

21   create and release and market great records; is that

22   correct?

23         A.      Right.

24         Q.      And at a profit, of course.  I assume you're

25   not a charity; is that right?

1          S. McKEEVER

2      A.      No, we're not -- we do have a 501(c)(3).

3  There's a lot of charitable aspects to our business.  But

4  to be able to keep doing it, we're trying to make a

5  profit.

6      Q.      But this is not a 501(c)(3) corporation.

7      A.      Right.

8      Q.      Now, this sounds complex.  Is it, releasing

9  records?

10     A.      There's a lot of moving parts.

11     Q.      In talking about those moving parts, I suppose

12  that --

13     A.      But I wouldn't -- I don't know if I could call

14  it -- you know, I guess like if somebody who doesn't play

15  keyboards watches me play, if you don't understand it it

16  looks really complex.  And when you're doing it for a long

17  time you can, you know, it's something you can do fairly,

18  you know, easy.

19          This court reporter, looking at that, the

20  keyboard, and I don't know any of those what those buttons

21  are.  That's complex.  I'm sure to her, she's been

22  thinking about what she's got to pick up on the way home

23  as she's typing this.  And our words are going in her head

24  and coming out.  And I think to some degree a lot of

25  things about putting a record out are fairly instinctful

1                           S. McKEEVER

2       as well.

3           Q.      That's fair enough.  For purposes of my

4       question, I mean complex in terms to the average person.

5       I mean in the way that brain surgery might tend to be

6       complex to you or I but to a neurosurgeon might not be so

7       complex.

8           A.      Yeah.  I mean, it depends.  I'm not sure I

9       would even grant that in the sense of the real basics of

10      what happens is not that unlike many other, you know,

11      businesses.  But what we do is taking things that are in

12      the air that you can't see, touch or feel.  I mean, you

13      audibly hear them.  So obviously getting a level of mix or

14      mastering or all of these other aspects may be steps that

15      the public doesn't know about.

16              But I think because of Entertainment Tonight

17      and all those now the sophistication that the audience has

18      on the process, The Making Of and everything else, I would

19      suspect that at least the record-buying public, not the

20      someone who doesn't listen to the radio, but I think the

21      people who are real fans are shockingly sophisticated

22      about.  What goes on the internet now is exposed, and a

23      ton of sort of at least what the process is in different

24      stages.  So at least the real diehards seem to know a lot

25      of, you know, the process of making a record.

1                              S. McKEEVER

2          Q.      I understand.  I would like just for clarity

3     of the record, though, to focus my question more

4     specifically on the moving parts, as you called it, to the

5     entertainment industry.

6                  I assume there's issues or steps involved in

7     releasing a record that are complex to the average person.

8     Is that a true statement?

9          A.      I guess so.

10         Q.      Marketing, for instance?  There's

11    manufacturing, marketing, accounting; is that correct?

12         A.      Yes.

13         Q.      Legal?

14         A.      Yes.

15         Q.      Clearances?

16         A.      Yes.

17         Q.      Distribution?  What are some of the other

18    processes or moving parts, as you called it earlier,

19    involved --

20         A.      I mean, there's technical as well as mixing,

21    mastering, sequencing, you know.  There's -- there are

22    things just like in making a movie.  The better you do it,

23    the less that's noticed, you know.  If you're a movie

24    that's put together very, very well, you're not sitting

25    there thinking:  Wow, that's a great special effect.

1          S. McKEEVER

2     You're scared by it.

3          Q.     There's a lot of paperwork, too, in the

4     releasing of records, isn't there?  Clearances and

5     mechanical licenses and things like, waivers?

6          A.     I don't know if it's a lot, but there's

7     paperwork that, you know, now, I guess, e-mails, I guess.

8          Q.     Let me ask you a question.  Have you seen the

9     file records for Bebe Winans' joint venture with Hidden

10    Beach?

11         A.     Never.

12         Q.     You've never seen the records?

13         A.     No.

14         Q.     Would it surprise you to learn that they fill

15    up virtually an entire case of a file cabinet, an entire

16    level of a file cabinet, a large file cabinet?

17         A.     For just the BeBe project?

18         Q.     Yes.

19         A.     I guess if it's every -- I can understand if

20    it's every draft of every contract, everything that is,

21    you know, gone back.  But I have never seen the files.

22         Q.     But it wouldn't surprise you or it would

23    surprise you?

24         A.     I guess thinking about it, I guess, you know,

25    two records.  If it's, you know, every draft, I guess it

S. McKEEVER

1

2 probably wouldn't -- I wouldn't be shocked, but I wouldn't

3 have thought that, necessarily.

4      Q.      Going back to my question again.  There's a

5 fair amount of paperwork involved in releasing a record;

6 is there not?

7      A.      Yeah, I guess a full case is -- I mean, my

8 thing is a contract can be 20 pages or whatever it is.

9 And there may be, if it goes back and forth 10 times, you

10 know, that's 200 pages if somebody has kept every draft of

11 a contract.

12          I guess now in the day of e-mail, almost no

13 one sees paper, you know, from that standpoint area at

14 least.  I don't think that much in terms of sort of paper

15 and volume.  But, yes, I do see, you know, a tremendous

16 volume, for example, of e-mail.

17      Q.      Well, tell me.  Just help me understand better

18 the steps involved in releasing a record.  I gather you're

19 saying that there's a lot of moving parts.  There's a lot

20 of steps to be taken; is that correct?

21      A.      There's a number of steps.

22      Q.      All right.  Tell me about those number of

23 steps.  I mean, in a project like, for instance, the Dream

24 album.  Tell me about some of the steps or paperwork that

25 would be required in that.

1          S. McKEEVER

2      A.      Paperwork?  It was an artist agreement with

3  BeBe.  There would be -- I mean, I can tell you all the

4  steps, but just as far as all the paperwork, that would

5  be --

6      Q.      Let's talk about the steps first, please.

7      A.      Steps is signing the artist so there's an

8  artist.  Then the next step is figuring, okay, what's

9  going to be on the record.  So creative steps of what is

10  the record going to be called, what is the name of the

11  record, what is -- you know, what are the specific songs.

12          Actually in self-contained type projects like

13  BeBe, because BeBe is actually a writer himself, it's not

14  -- those projects don't feel like a thousand steps because

15  you're dealing with, you know, someone who is all in one.

16  If I'm dealing with an artist, you know, people can't

17  sing, like Britney Spears, you know, who are sort of

18  manufactured with producers on the outside, and there's a

19  different producer on every song, and there's somebody

20  writing the song, and there's somebody producing the song,

21  you know, that can be very complex.

22          But when we principally deal with, you know,

23  fairly self-contained artists, I mean, they write the

24  material, and those are usually, you know, the major

25  decisions.  There's like two people in the room, meaning

1                          S. McKEEVER

2    me and the artist, or me the artist and --

3         Q.    All right.  I understand.  I'd like, though,

4    to clarify what your position is on this because I'm still

5    not sure whether you're saying that record manufacturing

6    and distribution is a relatively simple process or whether

7    there are a lot of complex steps.

8              Are you saying it's a relatively simple

9    process or there's a lot of complex steps or neither?

10        A.    Well, this is where we may be splitting hairs

11   is the word "complex."

12        Q.    Okay.

13        A.    I think when you -- I said there's a lot of

14   steps.  I mean, there's a lot of moving parts.  There's a

15   lot of different people who do their --

16        Q.    Let's talk about the moving parts and maybe we

17   can be on the same page.

18              In creating the record, does someone have to

19   decide the budget?

20        A.    Yes.

21        Q.    Does somebody have to pay that money out to

22   the musicians and the side men?

23        A.    Yes.

24        Q.    And the engineers?

25        A.    Yes.

1                      S. McKEEVER

2         Q.      Does someone have to hire all these people?

3         A.      Yes.

4         Q.      Does someone have to get union clearances with

5 these people?

6         A.      Yes.

7         Q.      Does someone have to get I-9 forms for these

8 people for immigration?

9         A.      I don't know.

10        Q.      Does someone have to get work-for-hire

11 agreements with these people?

12        A.      That's generally done. But I guess --

13        Q.      Allow me to complete my question so we can get

14 further ahead on this.

15              Does somebody then have to decide what name to

16 call the album?

17        A.      Yes.

18        Q.      Does somebody have to generally trademark or

19 protect that name?

20        A.      Yes.

21        Q.      Does somebody then --

22        A.      Well, not necessarily. No.

23        Q.      Perhaps. Is that correct?

24        A.      Generally not.

25        Q.      Not at all? They don't protect the name of an

Case 3:06-cv-00979     Document 106     Filed 07/16/09     Page 59 of 135 PageID #: 881

S. McKEEVER

1

2    album?

3        A.    Generally I don't think so.

4        Q.    Does someone have to get the rights for the

5    songs to be put on the album?

6        A.    No.  If it's a self contained -- that's what

7    my --

8        Q.    No, no.  I'm just talking about an album that

9    there are songs on an album.  Does someone need to get

10    permissions to use those songs on an album, whether they

11    are with the artist who performs on the album or some

12    other writer that's not on the album?

13        A.    It's generally those issues are covered in the

14    artist, you know, all those issues.  That's what I mean

15    one step.  The artist agreement covers a lot.  You know,

16    the basic practice covers if an artist writes a song, we

17    don't have to go and --

18        Q.    I understand.  But I'm talking about the

19    steps, sir, of making a record.  And your position that

20    it's not necessarily that complicated -- or maybe it is.

21    I'm not sure what your position is.  But I want to

22    understand what those steps are.

23            Is it true, then, that mechanical licenses

24    need to be acquired for the record?

25        A.    Right.

1                    S. McKEEVER

2        Q.    Is it also true that the agreements with the

3    side men need to be in place, the people who perform on

4    the album?

5        A.    Yes.

6        Q.    And is it true that there needs to be

7    distribution agreements for that record when it's finally

8    made?

9        A.    Yes. But you understand, I think, your line

10   of questions is making the point that I was making, that

11   all those are natural components.

12       Q.    Right. But I'm talking about --

13       A.    But once we have a distribution agreement,

14   there's no need to get a separate distribution deal for

15   each album.

16       Q.    I understand.

17       A.    Once we make a deal with an artist, almost

18   every one of those pieces you've talked about, you know,

19   with the engineer, the different aspects, is dealt with,

20   you know, unless we, you know, our help is needed in this

21   case is dealt with with the artist and the --

22       Q.    But there are marketing decisions to be made

23   on the record as well, aren't there?

24       A.    Oh, yes, definitely. What songs are going to

25   be the first single.

S. McKEEVER

1

2      Q.     Right.  And if there are joint artists on the

3  album, that is, if an artist from another label appears on

4  the album, then you need clearances for that.

5      A.     Exactly.  Right.

6      Q.     If you use text from a speech on an album,

7  that text needs to be acquired in order to use it;

8  correct?

9      A.     Yes.  In fact, on the Dream album was probably

10  the most single complex process to clear that song with I

11  have almost ever been involved in.

12      Q.     If the recordings on the label are later then

13  used for marketing and promotion, there's more paperwork;

14  correct?

15      A.     You mean for sale marketing promotion.

16      Q.     Sale marketing promotion purposes.

17      A.     You mean like TV commercial.

18      Q.     Exactly.

19      A.     Yes.

20      Q.     If there are giveaways of product for

21  promotional purposes, there may be paperwork involved in

22  that if someone wants your product?

23      A.     Yes.  But again, my point and the hair of

24  "complex," for example, if someone wants to license our

25  song for a film, we may -- it may be a piece of paperwork,

S. McKEEVER

1

2   but it may not be very complex.  Here's an offering, one

3   sheet of paper.  Fax back that day or tell somebody that,

4   you know, we're get a phone call, Is this fine.  The way

5   that the business works is with somebody would be on the

6   set of -- we want to make sure we're going to be cool to

7   use X, Y, and Z in a TV show.  We're going to pay you $500

8   or whatever the fee may be.  Oh, wow.  That's great.  We

9   love that show.  We want this up and --

10      Q.      But these add up, don't they, all these

11  agreements?  They become --

12      A.      No, they become -- I'm just saying they may

13  not even be -- the paper is not just complex.  I mean, it

14  may be five lines on it.

15      Q.      What I'm talking about are the number of steps

16  involved.  I'm not talking about the size of the

17  paperwork, although that's another issue.  What I'm

18  talking about are the numerous steps involved in

19  administrating, exploiting a record release.

20      A.      Mmh-hmm.

21      Q.      And would it be fair to say that by the time

22  you've looked at the use of master licenses acquiring

23  mechanicals, clearing samples, taking care of the

24  management or the artist agreements, the work for hire

25  agreements, the text licenses, the publicity rights, all

S. McKEEVER

1
2   of the various factors, and you've made your marketing

3   decisions, and you've protected your logos and your marks,

4   and you've decided how to license out product, and how to

5   use other artists on the project, it can be a very, very

6   involved process.

7       A.    It can be, but it doesn't have to be.

8       Q.    Okay.  Typically how long are artist

9   contracts?  A page?  Two pages?

10       A.    I think they've gotten shorter, you know,

11  since I was doing them.

12       Q.    How long are yours?

13       A.    Ours are fairly short because we attach the

14  standard terms that came from Sony, for example, when we

15  were at Sony.  So we really endeavor to make them as, you

16  know -- to not have, you know, the artist or, you know,

17  have to pay for some enormous, you know, going through 50,

18  60, 70, 80-page or 100-page agreement.  That our goal was

19  always to try to make things as succinct as it could be.

20       Q.    Would it surprise you, then, to learn that

21  your artist agreement with Bebe Winans was 40 pages long?

22       A.    That's a shorter.  A 30-page agreement is, you

23  know.  I was going to say 30 pages.

24       Q.    So it wouldn't surprise you to learn of an

25  artist contract 40 pages long?

1                          S. McKEEVER

2          A.      No.

3          Q.      That you consider fairly short?

4          A.      Compared to how they had been in the past

5     years.

6          Q.      Much longer still?

7          A.      Much longer.  Twice as more.

8          Q.      But for purposes of clarity here so we can

9     move on, it's fair to say that there are numerous steps

10    involved in manufacturing and exploiting a record; is that

11    not true?

12         A.      Yes.

13         Q.      Now, I suppose as a condition to all of this

14    that before you release records a company needs certain

15    rights and clearances, is that correct, before releasing a

16    record?

17         A.      Yes, but the --

18         Q.      Tell me what those rights are.

19         A.      You need the right from the, you know, the

20    artist to release the record.  Like I said, a lot of those

21    things are all covered in the --

22         Q.      I know, but I would like you to tell me what

23    those rights are that need to be covered before a record

24    can be released.

25         A.      The rights from the artist to embody their

S. McKEEVER

1

2  recording on the record. If it's a separate writer,

3  separate producer, there will be -- there's usually not a

4  writer's agreement but there's a producer agreement to

5  figure out how many points or, you know, under what terms

6  the producer is done.

7      Q.    Is that all the producer agreement does is

8  figure out the points? Or does the producer agreement

9  assign any rights?

10     A.    Doesn't -- no, they don't assign any rights.

11     Q.    There's no work for hire clause in a producer

12 agreement?

13     A.    Yes, I think there is.

14     Q.    Work for hire right and assignment of rights?

15     A.    I guess that is -- that would be a considered

16 an assignment of -- I mean, but everyone who works on a

17 record is generally, unless there's some different

18 arrangement made, you know, work-for-hire basis.

19     Q.    Okay. So tell me about the rights again.

20     A.    But you also figure out how much you get paid

21 per side, a producer. If there's separate --

22     Q.    What about publicity rights? Is there a -- is

23 that a right that needs to be licensed or assigned?

24     A.    I've never heard of it that I know of.

25     Q.    You've never heard of use and name of likeness

Case 3:06-cv-00979    Document 106    Filed 07/16/09    Page 66 of 135 PageID #: 888

1          S. McKEEVER

2     of a producer or artist?

3          A.     Not -- for artist, yes, but not for producer.

4          Q.     So producers normally wouldn't -- in other

5     words, that wouldn't be a right that a record label would

6     need to acquire name and likeness rights of a producer in

7     connection with the promotion of a record.  Is that your

8     position?

9          A.     I've not -- I'm not familiar -- I've been

10    doing this 20 years.  I've never heard of unless there was

11    some kind of campaign where you were trying to use a name

12    and a likeness of a producer as something that helps sell

13    a record.

14         Q.     Would you need sample clearances from a

15    record?

16         A.     Yes.

17         Q.     Why?

18         A.     Because those samples are owned by, you know,

19    a third party.  So if a sample is used by someone -- if a

20    record embodies something that, you know, the artist can't

21    grant those rights to, you have to go out and make a deal

22    for --

23         Q.     Like a text speech, for instance?

24         A.     Right.  Like we did for the King piece.

25         Q.     And I take it also name and likeness rights.

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 67 of 135 PageID #: 889

S. MCKEEVER

1

2    If you're using name and likeness or publicity rights of

3    someone, you need to acquire those rights; is that

4    correct?

5         A.    If you're using it.

6         Q.    If you're using it.  Yes.  You need to acquire

7    that.

8              And what about mechanical licenses we spoke of

9    earlier?  That is, the song copyrights, the ability to

10   actually perform or record those songs.  That's a right

11   you need to acquire; is it not?

12        A.    Yes.

13        Q.    And as far as work for hire, anybody who is a

14   co-owner of the project initially needs to sign off on the

15   project to have it used; is that right?

16        A.    What do you mean co-owner?

17        Q.    Well, for example, I write a speech.  You

18   can't use my speech.  Would you not concede you cannot use

19   my speech without me either assigning my rights to you or

20   granting you the rights in some form to use it because I

21   am the creator of that speech?

22        A.    Right.  Of course.

23        Q.    Well, if I create a record, if I go into my

24   basement and create a record tonight, is it your position

25   that you can use my recording without my grant of rights?

1                    S. McKEEVER

2        A.      No.  Of course not.

3        Q.      So you need to acquire the creative rights of

4   somebody who is a co-owner of the record or an owner of

5   the record; is that correct?  You wouldn't use a record

6   without talking to the people who have actually created

7   it.

8        A.      I'm not sure about that in the sense that --

9        Q.      Whose property is a record when it's created

10  by an individual?  Does it belong to them or does it

11  belong to the person who pays for the record?

12       A.      For example, it may be helpful just to be more

13  specific with examples.  If you said if you went into your

14  basement and recorded a record, we put records out all the

15  time without necessarily talking to every person down the

16  food chain.  If you worked on a record with Bruce here,

17  and we had a record agreement with Bruce that you're going

18  to get -- you know, everybody you're going to deal with

19  is, you know, is within this sort of the purview.  You

20  take care of all the rights that we would need.

21              And someone came into your house and played

22  flute on the record or whatever, and your record was done

23  down in your basement, so to speak, we would not go down

24  -- we would, you know, rely on Bruce saying this is the

25  record I've got, I'm abiding by my contract, and all these

1                        S. McKEEVER

2    things are going to be taken care of.

3         Q.    I understand.  I understand.  We're on the

4    same page there.

5              So correct me if I'm wrong.  What you're

6    saying is that you wouldn't release the record without a

7    grant of rights of the people who created it, but you

8    might look to, for example, one of the people involved in

9    the project --

10        A.    Right.

11        Q.    -- to speak for the others?

12        A.    Exactly.

13        Q.    Is that what you're saying?

14        A.    Yes.

15        Q.    All right.  Now, the rights we've talked about

16   that you would ensure that were nailed down have included

17   samples; correct?

18        A.    Yes.

19        Q.    Mechanical licenses?

20        A.    Yes.

21        Q.    Works for hire?

22        A.    Yes.

23        Q.    That is someone's creative component?

24        A.    Right.

25        Q.    Publicity rights, if you use them?

1          S. McKEEVER

2     A.     I'm not familiar with us having to other than

3   maybe like the King issue, which was a complex issue.

4     Q.     Okay.  Artwork?  If you're using that on a

5   record would you acquire those rights before it's

6   released?

7     A.     Yeah.  Of course.

8     Q.     And also any other rights that -- if you had a

9   musician on the album who was signed to --

10    A.     Signed to someone else, yeah, you get a waiver

11  from the other label.

12    Q.     You'd take care of all those rights before the

13  record was released, wouldn't you?

14    A.     You take care of them, yes, whether it's --

15  there's a -- in the business, though, there's -- taking

16  care of means if Alex Kesicbasian was signed to another

17  label, we wouldn't put it out until we had some heads up

18  okay, that we've got that you usually give a courtesy

19  credit on the album.

20           However, to answer your question about the

21  paperwork may sometimes follow, you know, quite some time

22  after the actual record is, you know, released.  So we'll

23  get the rights -- I mean, we'll have some kind of a verbal

24  agreement about it, and then you know -- and this is you

25  know --

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 71 of 135 PageID #: 893

1                        S. McKEEVER

2          Q.      You make sure you had it --

3          A.      Oh, yeah, we wouldn't have it --

4          Q.      If there was a problem.

5          A.      A problem.  Exactly.

6          Q.      Does the managing of these rights on a

7   day-to-day basis in your opinion require knowledge of the

8   music industry?

9          A.      Yes.

10         Q.      So it's not something that a lay person would

11  step in and do easily, would they?

12         A.      No.  Usually a lay person wouldn't necessarily

13  know about a sample, to ask the question, Are there any

14  samples on this record.

15         Q.      So getting back to my earlier question about

16  the business, steps being involved being complex, in that

17  sense they are more complex than what a lay person would

18  be comfortable doing; correct?

19         A.      Yes.  But it is more of a definition whether

20  it's -- whether understanding that is intellectually takes

21  some, you know, fierce acumen on someone's part to, you

22  know -- you've been able to do a better job succinctly

23  laying this out than even I have.

24         Q.      But certainly you went to Harvard Law School,

25  and you've worked in the industry for many years, and you

1                           S. McKEEVER

2    have negotiated many contracts with experience.  So what

3    may seem very straightforward to you, you have to admit

4    would be less straightforward to someone without that

5    training.

6         A.    Right.

7         Q.    Now, would it also be fair to say that a

8    person administering or managing the rights of a record on

9    a daily basis should have some knowledge of the laws

10   relating to the record?

11        A.    Yes.

12        Q.    And what laws in particular?

13        A.    Copyright, you know.

14        Q.    Trademark?

15        A.    I guess some degree of understanding.

16        Q.    Contracts?

17        A.    Contracts.

18        Q.    Union agreements?  When I say contracts, I

19   mean --

20        A.    That's, you know, what the basic requirements

21   are.

22        Q.    But copyright would you say that would be most

23   important thing to understand or is there something more

24   important than copyright?

25        A.    For somebody administrating?

1        S. McKEEVER

2        Q.    Yeah, somebody managing the records on a daily

3    basis.  What laws in particular would be most important

4    for them to know?

5        A.    Probably contract law, you know, I would guess

6    that.  And certainly the basics of -- I'm trying to think

7    what are governed.  Because the contract deals with a lot

8    of the waivers or, you know, on copyright or -- for

9    example, there's a thing called, you know, statutory

10   compulsory license or statutory limits as far as what

11   somebody is going to be paid for MTV, for example, doesn't

12   pay to my knowledge mechanical royalties on -- not

13   mechanicals but the copyright royalties, because those

14   things are waived --

15       Q.    Now, are these --

16       A.    -- by contract.  And so someone would need to

17   understand, I guess, what is the nature of what's agreed

18   to by the parties by contract.

19       Q.    Now, are these things referred to in the

20   copyright act, statutory royalties, or are they just

21   private terms of business as far as you know?

22       MR. PHILLIPS:  Mr. Chesser, let me just interrupt

23   just for a second.  This is a fact deposition, and the law

24   is the law.  We can stipulate for whatever reason you

25   believe necessary that the record business is a complex

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 74 of 135 PageID #: 896

1                  S. McKEEVER

2   business.  If you can focus on factual questions rather

3   than legal conclusions.  This is a fact witness not an

4   attorney.

5       MR. CHESSER:  I understand.  And that is my intent,

6   except that these issues are relevant to the policy of how

7   we -- how you think a record should be properly

8   administered and managed.  And to that extent I'm trying

9   to find the basis that underlies his opinion how a record

10   should be managed and how it should be treated.

11       Q.   But with that stated, I will try to summarize

12   this, Mr. McKeever, by just basically finding some common

13   ground here.

14          It's fair to say, is it not, that somebody

15   managing a record on a daily basis should be familiar with

16   some of the laws relating to it?

17       A.   Yes.

18       Q.   And those laws including copyright laws?

19       A.   Yes, but I think that, you know, again --

20       Q.   Copyrights are contracts.

21       A.   I'm really not trying to drag this out by

22   arguing with you on any of this, but it's just I think

23   that --

24       Q.   Mr. McKeever --

25       A.   -- the degree of --

1           S. McKEEVER

2           Q.      It's a simple question.  Are you saying that

3   someone does not need to be familiar with copyright to

4   manage a record on a daily basis?

5           MR. PHILLIPS:  Define "manage a record."

6           Q.      I mean to actually take care of these licenses

7   and these clearances that we've talked about earlier.

8           A.      I think if you went around, I think if you

9   went to every record company large and small, as a lawyer

10  your understanding of sort of copyright of what is

11  understanding copyright law you would probably find the

12  people who are doing the actual management of the process

13  and making sure that boxes are checked, is this in or not.

14  You would -- I might guess that you would find a low level

15  from somebody who is a lawyer dealing with copyright law

16  of knowledge of a lot of sort of basics of -- and I think

17  those people do their jobs -- a lot of them probably do

18  their jobs very well and without any incident.

19          Q.      I understand, Mr. McKeever.  And I'm not

20  trying to protract this either.  I'm not asking you to

21  guess, as I said earlier.  I'm just asking you a simple

22  question.  And you may not know the answer to it, but it's

23  either a "yes" or "no" or "I don't know."

24              And that is:  Do you believe that the people

25  in charge of managing these rights we spoke about, such as

1                         S. McKEEVER

2     these clearances, and these mechanical licenses, and these

3     samples, and the works for hire, and all of these other

4     rights we've talked about, should have some knowledge of

5     the law that's associated with these rights?

6          A.       Some knowledge, yes.

7          Q.       And would that law include copyrights?

8          A.       Yes.

9          Q.       Right. That's all I was asking.

10                  So in addition to your own expertise, would

11     you expect that somebody managing your business affairs

12     would also have such knowledge --

13          A.       Yes.

14          Q.       -- of these rights --

15          A.       Yes. And that job --

16          Q.       -- and the law relating to it?

17          A.       In that job specifically you would expect to

18     have, you know, more than somebody who is managing from an

19     administrative standpoint the checks and balances of that

20     process.

21          Q.       Right. So you'd expect them to know a fair

22     amount about the copyright; would you not?

23          A.       Right.

24          Q.       Now, did you establish policies at Hidden

25     Beach Recording regarding the steps that employees must

Case 3:06-cv-00979     Document 106     Filed 07/16/09     Page 77 of 135 PageID #: 899

S. McKEEVER

2 take to ensure that the necessary rights are acquired to a

3 record before it's released?  Did you establish those

4 policies?

5     A.     I mean, our contract does.  I mean, we don't

6 put out a record -- like you said, if you came to me with

7 -- if you came to me with a recording from your basement,

8 we wouldn't put a record out.  I don't know if that's our

9 -- I don't think that has -- it would be in our office

10 manual, I don't think --

11     Q.     Let me tell you what I'm talking about.

12 Yesterday in his deposition Mr. Patton referred to Hidden

13 Beach's policy for clearing a record or for acquiring

14 rights to a record before it was released.  And he said

15 those policies were communicated to the employees in the

16 human resource manual, the employees manual, and in

17 another agreement which he called, and I'm paraphrasing

18 this, but I believe he called it the artist management

19 policy.  Are you familiar with either of those policies?

20     A.     I know we have -- you know, Roger worked on

21 and we've worked on an office manual.  I just don't

22 remember something as specifically about releasing,

23 because an employee wouldn't have anything to do with

24 releasing, you know, the final decision about putting a

25 record out.  And then --

S. McKEEVER

1

2        Q.      No, I'm talking about --

3        A.      And the artist manual we created, which is

4    just a guide to try to help artists, you know, understand

5    the many steps that take place prior to putting out a

6    record.

7        Q.      I'm talking, sir, about the do's and don'ts of

8    the record release, what rights you need to acquire before

9    the record is released, and what things that you don't do.

10   Is there such a policy that relates to that at Hidden

11   Beach?

12       A.      As far as copyright law, other than people

13   saying they can't release things that are unrelease -- I

14   mean, there are strict rules in there about somebody who

15   has a record in distributing it and/or making copies of it

16   and, you know, grounds for dismissal, and things like

17   that.  If someone -- but I don't know if -- I don't

18   remember if there's a page in there that says, you know --

19   because that's the job of sort of Business Affairs to

20   handle.

21       Q.      If Business Affairs said that -- if Mr. Patton

22   said that such a policy was already in place prior to his

23   employment at Hidden Beach and that you were responsible

24   for that policy, would you be surprised?

25       A.      I mean, a written policy or not --

Case 3:06-cv-00979    Document 106    Filed 07/16/09    Page 79 of 135 PageID #: 901

1          S. McKEEVER

2          Q.      A policy for the do's and don'ts about

3     releasing a record --

4          A.      Yeah.   Yeah.

5          Q.      -- and acquiring rights to it.  Did you create

6     such a policy?

7          A.      Not that I remember in writing.

8          Q.      Would you take a moment to identify this

9     document, please, sir, for the record.

10         A.      This is -- looks like a draft of, just from

11    the cover of it, Hidden Beach Recordings Office Manual.

12         Q.      Are you responsible for the drafting of that

13    document?

14         A.      No, Roger drafted this.

15         Q.      And you're sure that Mr. Patton drafted that

16    document?

17         A.      Yes.   I mean, I read it.  I remember and told

18    him how I wanted it to -- what it should feel like.

19    Meaning we had -- Alex had brought a document I think from

20    his previous employer that was a very, very sort of rigid

21    corporate document.  And what we wanted this to be is

22    something that would breathe and reflect our real policies

23    that were going on inside of the company.  And so I wanted

24    -- I wanted to take, you know, sort of the basic rules of,

25    you know, business work but also there are things that we

1           S. McKEEVER

2    do in the company that we wanted people to understand how

3    we operated, what our general guidelines were.  So it

4    didn't exist before Roger got there.

5           MR. CHESSER:  I see.  Could we mark that as the next

6    sequential exhibit please.

7                (Exhibit 3 marked for identification.)

8           Q.    Mr. McKeever, are you familiar with that

9    document?

10          A.    I haven't -- I've seen it.  I haven't seen it

11   in years.

12          Q.    Is it still effective and valid that document

13   that you're looking at?

14          A.    I'd have to read it again because, you know,

15   we've changed human beings.  This is -- for example, Dress

16   Code I remember there's a whole -- in fact, here's the

17   first line of this says, "Hidden Beach has grown from

18   three employees, which is Steve, Miles, and Charles.

19   Miles is my dog.  So, I mean, that's how --

20          Q.    Are there any --

21          A.    You know, it's an extremely informal operation

22   in its current state.  These need to be one place -- I

23   mean, I can read what --

24          Q.    Take a moment to look at this, please.  And

25   particularly I'd like to know, Do you see any provisions

S. McKEEVER

1
2    in there that relate to the do's and don'ts of employees

3    working for your company in acquiring rights to a record

4    before it's released?

5        A.    I don't know.  I would have to look and see.

6        Q.    Take a moment, please.

7        MR. CHESSER:  Can we go off the record for a moment,

8    please.

9            (A discussion was held off the record.)

10       Q.    We're back on the record.  And before we

11   broke, Mr. McKeever, I asked you to take a look at an

12   exhibit which is labeled 3, which purports to be Hidden

13   Beach's recording office manual.  And you've had a moment

14   to review this.  Is this still an accurate reflection of

15   company policies at Hidden Beach?

16       A.    Yeah, I think it's pretty -- I mean, there

17   have been some people who have changed, you know, in jobs.

18   I was trying to make at least the tone of this in fairly

19   specific to our -- I mean, just looking at it, I mean, we

20   probably need to sort of put this out again and update it

21   and things like that.  But just general, you know,

22   professional conduct.

23       Q.    So the answer is yes?

24       A.    Yes.

25       Q.    And is there any language you can determine

S. McKEEVER

1

2  here that relates to the do's and don'ts of acquiring

3  rights before a record is released?

4      A.      I have never seen that in an office manual

5  before.  I don't see it necessarily in this.

6      Q.      All right.

7      A.      There may be a, you know, do's and don'ts of a

8  Business Affairs office or something.  But the general --

9  this is for -- this deals with what kind of sneakers to

10  wear in the office, you know --

11      Q.      Read, if you will, paragraph 11 of the

12  agreement.  What is the --

13      A.      Of the agreement?

14      Q.      Of this policy manual.  Correct me.  Yes.

15  Paragraph 11.  Would you read that please for the record,

16  the title of the paragraph 11.

17      A.      Yeah, the "quickest ways to get fired."  I

18  thought about that.  It says "quickest ways to get fired."

19      Q.      What is item 1 on that?

20      A.      Theft of any sort would be an unauthorized CD.

21  Theft would be prosecuted criminally.  We're really not

22  kidding about this.  Which we've done, actually.

23      Q.      I see.  And that's because the CDs are Hidden

24  Beach's property, I presume.

25      A.      Right.

1                        S. McKEEVER

2       Q.      What is item No. 2?

3       A.      Distributing prereleased music to anybody.

4       Q.      And why is that a quick way to get fired?

5       A.      Inside the company there's 10,000 reasons.

6   Because if it's prereleased music inside the company, you

7   work with an artist whose works that may not be finished

8   or may not be meant to be, you know, heard by that artist

9   to the outside world that our trust is there that we have

10  to listen to it to be able to give advice to put that in

11  the proper position.  So it's for somebody to let that go

12  out.  Because you work in the company, you will hear works

13  in progress or things that aren't finished and things that

14  may have mistakes in them or sentiments that need to be

15  worked out or whatever that may be.  And putting out --

16  like the same thing as why you would not want someone in

17  your office taking your notes and, you know, putting that

18  on the internet or something before your final piece of

19  work.

20      Q.      It's not their property to put out; is that

21  correct?

22      A.      Yes.

23      Q.      It's your -- they don't have the rights to put

24  it out.

25      A.      Right.

1       S. McKEEVER

2       Q.      There's nothing else in there that you saw, is

3   there, relating to clearances or acquiring rights --

4       A.      It wouldn't be in an office manual.

5       MR. PHILLIPS:  For purpose of clarity, I'm not sure

6   that he testified that that had anything to do with

7   clearing rights.

8       MR. CHESSER:  Who testified?  Are you talking

9   about --

10      MR. PHILLIPS:  The witness.

11      MR. CHESSER:  -- Mr. McKeever?

12      Q.      Yeah, I want to make sure.  Did you testify

13  this has anything to do with --

14      A.      No.  Never.  You brought this up; I didn't.

15      Q.      Actually this document was discussed by Mr.

16  Patton yesterday, which is the reason why we're discussing

17  it today.  Mr. Patton also mentioned that there was a

18  document entitled Artist Manual.  And I have been provided

19  an envelope which bears that same marking Artist Manual.

20  And in it I found a duplicate copy of this document you

21  are now referring to entitled Hidden Beach Recording

22  office manual.

23      A.      It's --

24      Q.      Is there an actual artist manual?

25      A.      We started to write one which was -- we called

S. McKEEVER

1
2   it an Artist Release Curriculum.  And we started to work
3   on -- you know, because again, our goal was to try -- we
4   have a different relationship.  It aspired to a very
5   different relationship than record companies do with
6   artists.  And so our goal was to demystify the process,
7   not make it complex as you're talking about.
8       Q.     Does that document deal in any way with the
9   policies of the label regarding releasing masters?
10      A.     I can't remember.  I don't --
11      Q.     Is that document binding or has it been
12  communicated to the employees?
13      A.     Probably not to the employees.
14      Q.     Is it a work in progress that document?
15      A.     I just can't remember.  I know we sent out --
16      Q.     Who would know the answer to this?
17      A.     I think -- I mean, I could find out with
18  just --
19      Q.     Who would you contact to find out?
20      A.     Roger or even my assistant or an old
21  assistant.  We have handed out something called Artist
22  Release Curriculum.
23      Q.     To whom?
24      A.     To artists.  Which is a four-page, very short.
25  It's a freshman, sophomore -- we broke down all those

1          S. MCKEEVER

2    different steps, those many moving parts.  We broke down

3    everything that you would have to do to make a record or

4    put a record out.

5          Q.    In that document?

6          A.    It put all the sort of basic steps and try to

7    make it as simple as possible so an artist could look at

8    almost and check to see where they stood in the process.

9          Q.    What's that document called again?

10         A.    Artist Release Curriculum.

11         Q.    Okay.  I'm going to be asking your attorney

12   for a copy of that.  It has not been provided to us.

13               And as far as you're aware, that document does

14   exist in a completed form; is that correct?

15         A.    Yes.

16         MR. PHILLIPS:  Let's go off the record for a second.

17               (A discussion was held off the record.)

18         Q.    Mr. McKeever, were you responsible for the

19   drafting of this Artist Release Manual that we spoke of?

20         A.    I was responsible for the idea of it.

21         Q.    Were you involved in the drafting of it?

22         A.    Yeah.  I led the discussion that we generated

23   from scratch these basic steps.

24         Q.    Is it an accurate reflection of what your

25   current policies are at Hidden Beach regarding artist

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 87 of 135 PageID #: 909

S. McKEEVER

1

2    release?

3        A.    I'd have to look at it again.

4        Q.    Without that document present, it's difficult

5    for me to ask you any questions.

6            Are there any other policies at Hidden Beach

7    regarding the steps employees must take to ensure that all

8    the necessary rights are secured to a record before it's

9    released?

10       A.    We use, you know, attorneys and, you know,

11   Business Affairs as far as -- and relying on our contract,

12   obviously, to cover us on those, you know, the basic

13   steps.  I don't know if there's -- again, other than the

14   Business Affairs and, you know, possibly some aspect of

15   Alex's, you know, position, and I don't know if there's a

16   receptionist wouldn't need to know or worry or think about

17   any of those types of things.

18       Q.    So are you stating that there is one written

19   policy or there is no written policy regarding the steps

20   that the label must take before a record is released?

21       A.    I don't think there's a written just like, you

22   know, we put out --

23       Q.    There is no written policy?

24       A.    I don't think there's any kind of a specific

25   written -- you know, other than we abide by our -- you

1                           S. McKEEVER

2      know, we don't put out a record without --

3           Q.     Is there an oral policy regarding the steps

4      that Hidden Beach must take to --

5           A.     Oh, yeah.

6           Q.     Allow me to finish my question.

7                  Is there an oral policy regarding the steps

8      that Hidden Beach must take in order to clear a record for

9      release?

10          A.     Yes.

11          Q.     And what is that oral policy, sir?

12          A.     With respect to what aspect?

13          Q.     To the release of a record. Is there a

14     checklist? Is there a list of do's and don'ts that

15     employees of Hidden Beach must follow or abide by before a

16     record is released?

17          A.     Yes. Like samples have to be cleared before

18     we put a record. You'd have to ask me the question. I

19     can't sit here necessarily and recite every, you know,

20     what is your policy with respect to samples. We get a

21     sample cleared, you know.

22          Q.     Do you talk to employees about the policy all

23     at once or do you just talk to them as the problem arises

24     as to what the solution is?

25          A.     You know, employees -- some employees have

S. McKEEVER

1

2   been there from day 1. So there's no -- like we've talked

3   about, it's a very small staff. It's not a situation --

4   so someone who's new would learn what those policies are

5   through the release of a record, you know, process.

6       Q.    You don't sit down with the employee when they

7   start and go through all the policies with them, do you?

8       A.    You know, if we hired a new receptionist, no.

9   Depending on -- if the person's job was in a Business

10  Affairs or possibly an A&R or something like that where

11  you're dealing with this, you would sit down and sort of

12  like, This is how we do things here.

13      Q.    Who would communicate that?

14      A.    Depends on who the person, you know,

15  informally or sort of more formally reported to and what

16  that person's job was.

17      Q.    Would that be you that might communicate the

18  policy to an employee?

19      A.    Yeah.

20      Q.    And would you in communicating the policy go

21  over clearances, samples, the things we talked about

22  earlier? Would you talk about that at once or would you

23  just wait until a problem came up and then talk about it?

24      A.    No, I mean there's so much of what -- you

25  know, depending on who you hired. I mean, for example, go

1                    S. McKEEVER

2   back to Roger, somebody who is extremely experienced in

3   business affairs and legal.  I wouldn't -- in fact, in the

4   legal areas he knows more than I know as far as being a

5   practicing attorney for, you know, a longer, you know,

6   sort of period of time than I did it and more up to date

7   with sort of recent things.

8            When I was practicing, the notion of samples

9   was just starting to come in to sort of as a concept.  It

10  wasn't a concept in the 70s necessarily as it was after

11  sampling became big in the 80's.  So there's all sorts of

12  things that new technology raises new legal questions.

13           For someone like Roger, it would be assumed as

14  far as what, you know, someone knows what the basic steps.

15  I would not sit down with Alex about GAAP rules in

16  accounting and how he tells me this is -- these are the

17  rules and you hire people who are experienced and experts

18  in these areas.

19       Q.    Well, let me be specific, then.  Would you

20  have a policy, oral or written, that you would relate to

21  employees as to what rights were essential to acquire

22  before a record was released?

23       A.    I think there's an unwritten, you know --

24  those are unwritten steps.  I mean --

25       Q.    Oral policy?

1                           S. McKEEVER

2          A.      Oral policy.  Yeah.

3          Q.      And what would that oral policy, in short, be?

4   What rights would you need to have before a record is

5   released?  The rights we talked about earlier?

6          A.      Yes.  I think so.

7          Q.      The ones that we've already discussed?

8          A.      Right.

9          Q.      All right.  Now, if you would, sir, in

10  relating to the Dream album and Christmas Prayer, did

11  Hidden Beach follow its policies to acquire all the

12  necessary rights prior to the release of those albums?

13         A.      I was told that we did.

14         Q.      Who told you?

15         A.      Roger and BeBe.  I know we had these

16  conversations because I was intimately involved in the

17  thing that held up the Dream album for probably almost a

18  year maybe, could be it was a long -- I had to sort of

19  personally get the rights to -- BeBe wanted to take the

20  album -- the song "Dream" off the record.  I felt so moved

21  by that single song, and he wanted to take it off because

22  it was difficult to obtain the rights to release it.

23         Q.      But you obtained those rights?

24         A.      I obtained those rights.

25         Q.      And they were very challenging rights to

S. McKEEVER

1

2      obtain, weren't they?

3          A.      Yes.

4          Q.      In fact, it's rather unprecedented to acquire

5      rights of that magnitude; is that correct?

6          A.      Yes, I think it was -- there were people from

7      Microsoft who tried to do something similar, to Coca-Cola

8      advertising agency when hearing the song were moved but

9      said you will never get the rights from the King estate to

10     do this.  And the King estate said this never has

11     happened.  We have never done it.  And it was my

12     relationship with members of the family as well as our

13     approach and our reputation as a company where we were

14     told that we are doing this -- and I was told specifically

15     -- We're doing this because of you and your care and your

16     reputation and because of my sincere --

17         Q.      I understand.

18         A.      You know, but that took a very long time.

19         Q.      And you would not have considered releasing

20     the album "Dream" as President of Hidden Beach without

21     first acquiring those rights from the Martin Luther King

22     estate.

23         A.      No.  Of course not.

24         Q.      Did you also acquire mechanical licenses to

25     the "Dream" and "My Christmas Prayer" album prior to the

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 93 of 135 PageID #: 915

1                          S. McKEEVER

2      release?

3          A.      I'm assuming that we did.   Yes.

4          Q.      And how about agreements with any side artists

5      that might have appeared on those albums?   Did you acquire

6      those?

7          A.      Again that's required -- the side artists we

8      didn't have any contact with, but that would have been the

9      responsibility for the person we contracted with, BeBe,

10     to, you know, have done that.   And I was told that all

11     that was done.

12         Q.      And you were told by whom?   Bebe Winans?

13         A.      BeBe.   I'm pretty sure.   BeBe and Roger.   But

14     mostly, as far as the actual people we were dealing with,

15     all the different people in that process, was BeBe.

16         Q.      Do you remember any specific instances,

17     places, times where BeBe actually sat down and said to

18     you:   I've acquired all the rights that I need to from Tom

19     Hemby to release the "Christmas Prayer" and "Dream"

20     albums?

21         A.      Yeah.   I mean, I don't think that -- he -- Tom

22     was I think a friend of his.   And he was, you know -- I

23     don't know which studio, because I never was in the -- I

24     may have done some creative direction to both records,

25     specifically on the "Dream" record, for example, but when

1    S. McKEEVER

2    he came to our company, essentially most of the "Dream"

3    recording we recorded the "Christmas Prayer" record after

4    BeBe wrote "My Christmas Prayer" and wanted to do a whole

5    album.

6           And BeBe did, you know, kind of the

7    impossible, got it done on a very, very short period of

8    time, tried to make, you know, release date because we

9    didn't start it -- we started like three months later than

10   you normally would start a Christmas record, three or four

11   months late.

12          But even when I first met him, when he played

13   me, you know, some of the material, these were things that

14   he had done and, you know, had rights to. And I asked all

15   those questions. Is there any other -- he also has other

16   record deals.

17     Q.    Do you remember any specific instances or

18   times where you actually sat down with BeBe and said:

19   I've cleared all the rights for this record?

20     A.    Those words --

21     Q.    Or words to that effect.

22     A.    Yeah. Of course.

23     Q.    What are those specific times? When did he

24   speak to you?

25     A.    I mean, when we first -- the very first

S. McKEEVER

1

2  meeting playing me "Dream." Like my questions were -- he

3  was signed to Motown. He was signed to Capitol. He has

4  many record deals. My first question was: "Does any of

5  the prior deals have any standing on this material?"

6          "No, this is free and clear. This is all

7  mine. I own this. I've recorded. I've paid for. These

8  are, you know, things that I've done. And you know, which

9  led us to enter into an agreement with him to acquire

10  that.

11     Q.    Well, it's fair to say, then, what your

12  position is is that in releasing a record Hidden Beach's

13  policy is to ensure that the property rights of others are

14  properly acquired or granted before a record is released?

15     A.    Of course.

16     Q.    And in the case of "Dream" and "My Christmas

17  Prayer," Hidden Beach looked to Bebe Winans for the rights

18  necessary to release that album; is that correct?

19     A.    Yes. Of course.

20     Q.    And that's because they were property rights

21  involving somebody else like Tom Hemby, for instance?

22     A.    I don't understand your -- property rights?  I

23  thought he was a --

24     Q.    Let me make it clear. You testified earlier

25  that Hidden Beach wouldn't have released the Dream

1                    S. McKEEVER

2      speech --

3         A.      Right.

4         Q.      -- without permission from the Martin Luther

5      King estate.

6         A.      Right, because that's the one thing he told us

7      that he didn't have the rights to.  I mean, we knew -- and

8      I asked:  Did you have the rights to -- you can hear a

9      sample of the record many times.  When he played me --

10     when BeBe played me the first version of "Dream" -- just

11     to go back to give you -- it was a poet that was reading

12     the speech.  I said, wow, it would be great to get Dexter,

13     who sounds like Martin, Martin's son.  I already did that.

14     I've gotten Dexter.  He came back in the next time and had

15     Dexter on it.  And Dexter didn't -- it sounded great,

16     actually, but we said wouldn't it be great to do Martin

17     Luther King.  He went in and put Martin Luther King on it,

18     and we realized, wow, that was it.  We all knew we'd have

19     to get rights from the estate.

20        Q.      Because it was someone else's property, I

21     assume.

22        A.      Right.

23        Q.      Now, in the --

24        A.      But we could have done it without -- I mean,

25     we could have put it out with the poet -- no, actually

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 97 of 135 PageID #: 919

1       S. McKEEVER

2   maybe not on the speech.  We still probably need the

3   rights to the speech.

4        Q.    But, Mr. McKeever, in the interest of time and

5   efficiency, I'm trying to keep you on track because I know

6   you have other commitments today.  So I will ask you to

7   just confine your answers to my question itself.

8        A.    Okay.

9        Q.    A "yes" or a "no" or "I don't know" followed

10  by an explanation would be most helpful right now.

11            My question, related to the "Dream" and

12  Christmas album, was that the steps necessary to acquire

13  Tom Hemby's rights or permissions to use those albums were

14  taken exclusively by Bebe Winans.  Is that, sir, your

15  position?

16       A.    Whether he used -- I don't know if it's

17  exclusive.

18       Q.    Do you know of any steps Hidden Beach took to

19  acquire the rights of Tom Hemby prior to the release of

20  "Dream" or "Christmas Prayer" albums?

21       A.    I don't know.

22       Q.    Let me ask this.  Did Hidden Beach take any

23  steps, to the best of your knowledge, to acquire Tom

24  Hemby's publicity rights or name rights in conjunction

25  with the promotion of the album?

S. McKEEVER

1

2      A.      I wouldn't think so.

3      Q.      Did they take any steps to acquire his

4   work-for-hire agreement?

5      A.      I would think that that would have been, you

6   know, asked for through BeBe --

7      Q.      Excuse me, not --

8      A.      -- because we would normally ask for a

9   producer agreement, you know.

10      MR. PHILLIPS:  I'm just saying you guys are talking

11   over one another.  You need to let one another finish.

12      THE WITNESS:  Okay.  Go ahead.

13      Q.      Did in fact Hidden Beach ever attempt to

14   contact Tom Hemby regarding a producer agreement?

15      A.      Not to my knowledge.

16      Q.      Fair enough.

17      A.      We did know that there was one -- at least we

18   were told -- that there was one that was agreed to and it

19   was done.

20      Q.      But your position is that you looked to Mr.

21   Winans for those rights?

22      MR. PHILLIPS:  Let me just make a clarification.

23   You're saying "your position."  It's his testimony.

24      Q.      It's your testimony that you looked to Mr.

25   Winans for acquiring these rights.

1                       S. McKEEVER

2        A.     Yes.

3        Q.     Now, if Mr. Winans had told you flat out that

4    he couldn't acquire the rights to Tom Hemby's property,

5    what would Hidden Beach's policy have been prior to the

6    release of the record?

7        A.     We would never have been able to -- well, his

8    "property." Did Tom write anything on the record or --

9        Q.     Was Tom Hemby a co-producer on the record to

10   the best of your knowledge?

11       A.     Yes, I think --

12       Q.     Did Tom Hemby also make a creative

13   contribution to the overall sound quality of the record?

14       A.     I would assume so.

15       Q.     And was Tom Hemby's name used in terms of

16   liner notes on the record?

17       A.     Yes, but nothing in marketing or trying to

18   sell the record.

19       Q.     Was his name used on the record as the

20   producer, and did Bebe Winans talk about his --

21       A.     I think as a co-producer.

22       Q.     Allow me to finish my question, please, sir.

23              Did Tom Hemby's name appear on the liner notes

24   of the records as producer?

25       A.     I thought I remember haven't looked at it, but

S. McKEEVER

1

2    I thought it was a co-producer.

3    Q.    As co-producer.  Did he appear as a producer

4    on the "Passion" album, which featured one master from the

5    "Dream"?

6    A.    I don't know.

7    Q.    Did Bebe Winans's liner notes also contain any

8    praise of Tom Hemby's work on the "Dream" album?

9    A.    I don't remember.

10    Q.    It wouldn't surprise you, though, if it did

11    include praise and recognition of the work that Tom Hemby

12    had performed on the record?

13    A.    No.  I mean, like in the thank you's or

14    something?

15    Q.    Yes.

16    A.    Yeah, that's pretty customary.

17    Q.    And it wouldn't surprise you obviously to see

18    Tom Hemby's name on the liner notes as co-producer or even

19    as producer, would it?

20    A.    No.

21    Q.    Now, Mr. McKeever, if Mr. Winans had told you

22    that there was a 50% chance that he couldn't obtain Mr.

23    Hemby's rights, would you then, according to your company

24    policy, have still released the record?

25    A.    No, I don't think so.  I mean, if I had known

S. McKEEVER

2  there was a 50 -- because I think, if I remember

3  correctly, I even think our office worked with -- because

4  from time to time we needed multitracks or pieces.  So I

5  think what we may have dealt with Tom to get.  Directly on

6  contractual issues, I'm pretty sure that Tom had all the

7  multitracks, the parts to make up a record.  I'm pretty

8  sure our A&R people were dealing with him.  And he was

9  FedExing us stuff and giving us the materials for

10  promotional stuff.

11      Q.      It's your testimony, is it not, that if you

12  suspected there was a problem with acquiring Mr. Hemby's

13  rights you wouldn't have released the record?

14      A.      No.

15      Q.      In fact, would you have directed Hidden Beach

16  employees to investigate this?

17      A.      Oh, of course.

18      Q.      And did anyone at Hidden Beach to your

19  knowledge ever see a signed copy of Tom Hemby's grant of

20  rights to Mr. Winans or to Hidden Beach?

21      A.      No.

22      Q.      Now, I know it was very important that you saw

23  the grant of rights required, the grant of rights with

24  respect to the "Dream" speech.  Why was it not so

25  important to see that the paperwork had been done with

1           S. McKEEVER

2    respect to Tom Hemby?

3         MR. PHILLIPS:  I don't think he's testified that it

4    wasn't important.  But go ahead.

5         Q.    Well, was it --

6         A.    I didn't testify to that case.  But just like

7    we talked about, you know, earlier, in the timeline, if

8    the King estate had told me, the people I know, where the

9    people that I was dealing with were Dexter, the lawyers,

10   everyone says, You can go ahead and release the record,

11   we're fine, these are the basic terms, I would have said

12   we have this, and we would, you know, we would pay for

13   this process.  It wouldn't necessarily hold up the album

14   release date on the drafts of the lawyers going back and

15   forth.

16        Q.    Right.  But here's my question:  If you hadn't

17   received that assurance directly from the King estate,

18   then you would not have released the record?

19        A.    Yeah.  Of course.

20        Q.    My question, then, is:  What if you had

21   received that assurance from Bebe Winans that he had the

22   rights to the King estate speech?  Would you then have

23   released it without any other investigation, without

24   seeing a copy of the paperwork?

25        A.    That's what happened.  I thought BeBe

1                           S. McKEEVER

2      initially told me that he had the right -- it was -- he

3      had the rights, that he acquired --

4           Q.      That's not my question, sir.  I will repeat

5      it.  If --

6           A.      Yes, I would --

7           Q.      -- Bebe Winans had told you that he had

8      acquired the rights to the Martin Luther King speech

9      directly from the estate, would you have said, fair

10     enough, we're going to release the record, without

11     actually asking for a copy of the written agreement?

12          A.      Because this was, as you mentioned earlier,

13     such an unusual case and has never been done before, we

14     probably would have just in practical matter, you know,

15     and because of knowing historically -- if this was the

16     speech of Alex Kesicbasian, I would have said no, we

17     wouldn't have asked.  If it was a speech of Martin Luther

18     King, and one of the most -- the most famous recorded

19     speech in American history, you know, the Gettysburg maybe

20     the argument the other one, which is not recorded --

21          Q.      Because of its importance.

22          A.      Basically you want to see --

23          Q.      Mr. Hemby's agreement wasn't quite as

24     important.  Is that your testimony?

25          A.      No, I'm just saying it wasn't, you know, I'm

1          S. McKEEVER

2    saying the most -- this had never been done before.  King

3    -- the full intertwining what BeBe did was write the song

4    with every word written by Martin Luther King created a

5    set of issues that had never come up before.

6          Q.    Okay.  I understand.

7          A.    So --

8          Q.    But in the case of Tom Hemby again --

9          A.    Normal producer?  No.

10         Q.    But in the case of Tom Hemby again, you knew

11   Tom Hemby was co-producer or producer.  You knew that he

12   had a creative contribution to this project.  You knew his

13   name was featured on the liner notes.  And I take it you

14   also knew that Tom Hemby had not been paid any money as a

15   producer; is that correct?

16         A.    I didn't know that.

17         Q.    Well, someone at Hidden Beach would have known

18   that; is that not correct?

19         A.    At the -- you know, we paid money to BeBe.

20   BeBe administrated at least the initial part of -- I

21   thought -- in fact, I had no way of knowing who had been

22   paid or not been paid when BeBe came to us with the

23   "Dream" record as a fully recorded piece.

24         Q.    Did you reimburse him on any of these costs?

25         A.    Yes.  I mean, he got paid for --

S. McKEEVER

Q.     Then you would have known the people that --

A.     No, no, no.  You pay things as like we set a
price.  This album is going to be x-dollars.  We'll pay
you $10,000 for this album, and you pay your cost
accordingly.  Our position has generally been, you know,
you use the fund -- you assure us that these legal rights
are taken care of, and you have paid the people that must
be paid to assure its release.  And if you can pay -- if
we pay you $10,000 and you -- it costs you $5,000 to take
care of all those rights, that 5,000 is -- our only
concern is that the budget that we set.

Q.     You were responsible in the joint venture with
Bebe Winans for payment of funds in connection with the
production of the record.  Is that a correct statement?

A.     Yes.

Q.     And you indeed as Hidden Beach paid one of the
co-producers for the "Christmas" album a producer fee, Mr.
Mark Harris; is that correct?

A.     I don't remember that.

Q.     If I show you an accounting statement produced
by Hidden Beach will that refresh your recollection?  Or
do I need to show --

A.     Probably not.  I don't even see those.

Q.     Would you like to see Hidden Beach accounting

S. McKEEVER

1
2    statement?  Would that make a difference?

3        A.      I believe you.  I just don't even remember the
4    name Mark Harris.

5        Q.      So if Hidden Beach had paid one of the
6    co-producers of the "Christmas" album, why would they have
7    not paid Tom Hemby as well?

8        A.      What I remember at the time -- I don't know if
9    it was the "Christmas" album -- that Tom Hemby had agreed
10   to -- and I did hear this, and I don't remember in what
11   period of time, and I don't know, I'm thinking I may have
12   heard this after the record had come out -- that Tom Hemby
13   had agreed -- or at least what we were told by BeBe, and I
14   remember asking Roger around the same time -- Hemby had
15   agreed to $10,000 and then changed his deal and wanted
16   $30,000.  And so that's the -- I think that they -- BeBe
17   was trying to sell that and figure that out what he
18   wanted, you know, before, but he would have always had the
19   ability to sort of pay him that amount.

20       Q.      Did you know of this problem from Bebe Winans
21   before the record was released or after --

22       A.      This was I'm pretty sure was sometime after,
23   actually.

24       Q.      And did you ever see a copy of the co-producer
25   agreement of Mark Harris?

S. McKEEVER

2     A.    I just said I don't remember his name.

3     Q.    Would Hidden Beach have received a copy in

4 their files of that agreement?

5     A.    I don't know.

6     Q.    All right. But did it not trouble you

7 ethically as well as legally that there was no payment

8 records in Hidden Beach files to Tom Hemby as a

9 co-producer?

10     A.    I didn't know that. I just said I didn't know

11 we hadn't paid him.

12     Q.    But somebody at Hidden Beach knew that; did

13 they not? Is your testimony that it's not something

14 Hidden Beach would have known? They would have relied

15 exclusively on Bebe Winans's testimony?

16     A.    Yeah, I mean -- again, I don't know that -- I

17 don't know how we end up paying Mark Harris directly if --

18 some people I know probably we may have paid directly at

19 BeBe's direction.

20     Q.    Who paid the royalties to the producer on the

21 "Christmas" album? Did Hidden Beach administer those

22 royalties?

23     A.    Yes.

24     Q.    And did they pay any royalties to the best of

25 your knowledge or account for any royalties to Mark

1          S. McKEEVER

2     Harris?

3          A.     I don't know.

4          Q.     But they would have in normal course?

5          A.     Yeah, of course.  Right.  If there's a letter

6     of direction for -- to do -- to pay directly.  If we had

7     an all-in situation with BeBe, and we had as our joint

8     venture, we would pay to BeBe, and he would pay out

9     according to what his individual deals were.

10          Q.     Right.  But there was no pay out as far as you

11    know to Tom Hemby.  That's correct.  As far as you know,

12    Hidden Beach never paid Tom Hemby a producer royalty or

13    accounted to him or paid him any upfront money; is that

14    correct?

15          A.     I didn't know that.

16          Q.     Oh, you didn't know that?

17          A.     No.  I mean, I didn't know that he -- you

18    know, at that point I didn't know that he had not gotten

19    anything.  The only thing I knew about Tom Hemby I knew

20    that he was BeBe's friend.  I knew he was the person

21    working with.  I know we had probably dealt with him as

22    far as getting, you know, tapes and materials because BeBe

23    just didn't have multitracks and things like that.  So I

24    know -- and my recollection that he was cooperative and a

25    nice guy as far as, you know, helping sort of pull things

1                    S. McKEEVER

2   together that BeBe didn't have his hands on.

3          But the only thing I ever heard about Tom is

4   that BeBe was trying to work out the situation where he

5   was going to get 10 or 30.

6      Q.    So if you had have known that Tom Hemby wasn't

7   being paid, that he was not -- there were no contracts on

8   file with him, and that there was no money being

9   distributed or an accounting of royalties being

10   distributed by Hidden Beach, you would have been alarmed,

11   I take it; is that correct?

12      A.    Yeah.  If I had known, exactly, that we

13   weren't paying -- that -- and that he had some dispute, we

14   would have, you know, contacted or tried to figure out how

15   to, you know, resolve it.  I thought that the only -- you

16   know, the only issue I guess was that that simple

17   difference.  And for whatever reason this was something

18   that was I guess fairly quiet.  And I don't remember --

19   and it wasn't anything that was kind of a red flag, oh my

20   God, this is --

21      Q.    Mr. Hemby deserved to be paid, basically.

22      A.    Of course.

23      Q.    And Mr. Patton testified yesterday, I believe,

24   that it was Mr. Winans's duty to look after payment of Mr.

25   Hemby and acquiring the rights.  And that's your testimony

S. McKEEVER

2   today also; correct?

3       A.      Yes.

4       Q.      If Mr. Winans stated under oath that Hidden

5   Beach had been left to cover the producer contracts on the

6   "Dream" project, how would you respond?

7       A.      You mean --

8       Q.      If that's was his testimony under oath, what

9   would you respond?  Is that a true statement?

10      A.      I don't know.  It would be the first I would

11  be hearing about that.

12      Q.      Is it true that Hidden Beach was left in any

13  way to contact Mr. Hemby and to cover the producer

14  contracts?

15      A.      This is --

16      Q.      Is it true:  Yes or no?

17      A.      I don't know.

18      Q.      So it could have been true?  Hidden Beach may

19  have been responsible for covering the producer contracts?

20  You just said earlier that Mr. Winans was responsible for

21  it.

22      A.      Yeah, he was.

23      Q.      So --

24      A.      I mean, but you're saying that BeBe said that

25  he had some agreement or conversation that we were to do

1        S. McKEEVER

2   it?  I don't know anything about that.

3        Q.    No, I'm saying if he had stated that under

4   oath that Hidden Beach was responsible or left to cover

5   the producer contract, would that be a true statement?

6        A.    I don't think -- I don't think so.  He could

7   be mistaken about that or he may have had, you know, there

8   may be some misunderstanding or it could have been -- you

9   know, I don't know.

10       Q.    All right.  But you and Mr. Winans -- Hidden

11  Beach and Mr. Winans operated a joint venture together.

12       A.    Right.

13       Q.    And for that purpose it really doesn't matter

14  either way whose transgression or whose omission or whose

15  misappropriation was involved here, because you're both

16  responsible for the other's actions.  Is that your

17  understanding?

18       A.    I guess to some degree.  But we have an

19  indemnity, you know, with respect to -- well, the joint

20  venture may be responsible.  Whether we are personally

21  responsible if there's an omission on behalf of one of the

22  partners is sort of a separate issue.

23       Q.    What would you say is the overall financial

24  condition of Hidden Beach Records?  Strong?

25       A.    No.

1                        S. McKEEVER

2       Q.      How would you describe it?

3       A.      All of this is obviously --

4       MR. PHILLIPS:  Confidential.

5       A.      -- confidential.

6               Strained.

7       Q.      Are you presently in default of any notes,

8   promissory notes or loans at Hidden Beach?

9       A.      Default?  We're not in default of anything,

10  are we?

11      Q.      You can't -- I'd like you -- if you don't know

12  the answer to the question --

13      A.      No.  I don't think so.  We are, I think, very

14  honorable.  We've operated that way.  You know, and our

15  total existence if there's been times we've had trouble to

16  make any type of payments that we work with whoever we're

17  dealing with.

18      Q.      The joint venture with Mr. Winans is now

19  terminated; is that correct?

20      A.      Yes.  That's correct.

21      Q.      And were there disputes or problems that arose

22  in working with Mr. Winans that led to the termination of

23  this agreement?

24      A.      Yes.

25      Q.      What were some of the nature of those disputes

1                           S. McKEEVER

2    and problems?  Well, actually strike that.  I'm going to

3    simplify this and ask you to look at a document, an e-mail

4    that was sent to you by Roger Patton, and ask you if this

5    indeed is a correct summary of some of the problems that

6    existed between you and Mr. Winans.

7              You produced that yesterday, Bruce.

8              Would you identify that document, please, for

9    the record.

10        A.    It's an e-mail from Roger to me 2005 March

11   15th, 2005.

12        MR. CHESSER:  Could we label that, please, as the

13   next sequential exhibit.

14             (Exhibit 4 marked for identification.)

15        Q.    Mr. McKeever, if you just take a moment,

16   please.  I'd like you to review that e-mail and tell me if

17   that is a correct summary of some of the problems that

18   existed between you and Mr. Winans as of the date that

19   that e-mail was reported to you.

20        A.    I haven't seen this obviously since...

21        Q.    Is that more or less a correct summary of the

22   problems that existed between Hidden Beach and Mr. Winans

23   at the time that e-mail was written?

24        A.    Well, there's one line here that summarized

25   our discussion that doesn't probably accurately summarize

1                     S. McKEEVER

2    what the problems were, but --

3         Q.    Which line is that, sir?

4         A.    "Life is too short."

5         Q.    And how would you accurately summarize that?

6         A.    That BeBe had a manager at the time.

7         Q.    Who was that manager?

8         A.    Kerri Brusca -- which in my years of business,

9    I generally have no problem getting along with anybody --

10   saw it as her job to -- she came in. She wasn't part of

11   the process when BeBe and I got into business together.

12   BeBe and I never had any acrimonious issues. We were able

13   to resolve things always outside of a contract figuring it

14   out.

15            I like BeBe. I think he's a reasonable,

16   super, super, super talented guy. And the problems

17   between us, though, came when he hired this woman to take

18   care of his business. And her approach toward business

19   was completely outside of how we like to -- our philosophy

20   toward business.

21        Q.    Did she contact your distributor at the time

22   on BeBe's behalf?

23        A.    Yes.

24        Q.    And that was Sony Distribution; correct?

25        A.    That's correct.

1                    S. McKEEVER

2        Q.     And did that in any way lead to undermine your

3    relationship with Sony?

4        A.     I don't know if it undermined.  It created

5    some problems with us with Sony, some major problems.

6        Q.     In what way?

7        A.     There was someone inside the company, Sony,

8    who did not have an understanding, who wasn't experienced

9    in our contractual relationship, and who took these

10   meetings I think maybe innocently and didn't realize that

11   -- other people around this Sony employee realized the

12   employee was in the wrong to take the meetings, but since

13   she had a fairly high level position I don't think she

14   realized that the ramifications of these separate meetings

15   with this manager.

16       Q.     Were there any other problems not summarized

17   in that document that arose between you and Mr. Winans?

18       A.     No.  I mean "life is too short" really sort of

19   sums up what the problems we're dealing with this manager,

20   who he, you know --

21       Q.     At the very end of that document, Mr.

22   McKeever, there's a second page.  Would you read the line

23   there on the second page?

24       A.     "To date BeBe has received roughly $200,000 in

25   advances.  If we did not cross the Dream album he would

1          S. McKEEVER

2     have received another $137,500 per Alex."

3          Q.     What does that mean?

4          A.     That the deal we had with BeBe was that we

5     were crossing both records.  Crossing means they're in one

6     pot.  So if one album is wildly unsuccessful and one album

7     is profitable, you don't have separate accounts for them.

8          Q.     Would it be fair to say, then -- you're

9     basically saying that the cross collateralization term is

10    basically -- your position, your testimony, is that it is

11    a case of the profits being only as strong as the weakest

12    record.  Is that a fair statement?  The profits only being

13    as strong or as good as the weakest record?

14         A.     No, it's a sum.  That's not true.

15         Q.     So if one record makes a lot of money, and

16    another record loses money, and they're cross

17    collateralized --

18         A.     It's the venture.

19         Q.     -- then the losing record drags the profitable

20    record's profits down; correct?  You add the money

21    together.

22         A.     It was a venture.  So the venture didn't make

23    -- if we lost $100,000 on a record, and we made $150,000

24    on a record, if we lost that the venture would have made a

25    $50,000.

1                    S. McKEEVER

2        Q.    I see.  So that line, then, means that the

3   "Christmas" album did much better in terms of its

4   commercial success than the "Dream" album did; is that

5   correct?

6        A.    After I did the deal with -- after we -- not

7   initially.  The "Christmas" record when it first came out

8   was not a major commercial success on any level.

9        Q.    But at the time that that document was

10  written --

11       A.    This must have been after the Starbucks.

12       Q.    And at the time that document was written to

13  you, is it fair to say that the "Christmas" album was

14  performing much better in terms of its profitability than

15  the "Dream" album?

16       A.    Yes.

17       Q.    And that line that $137,000 would be owing to

18  Mr. Winans refers to the fact that if these albums were

19  not cross collateralized you would need to pay Mr. Winans

20  an additional sum of money; is that correct?

21       A.    Yes, but the --

22       Q.    But they were collateralized.

23       A.    Yeah.  That's what I'm saying.  It was kind of

24  a fictitious kind of --

25       Q.    I understand, but I'm just trying to determine

S. McKEEVER

1
2    what that sentence means.  So your testimony is that that
3    line basically states that there would be more profits to
4    be paid to Mr. Winans if the two records weren't tied
5    together in terms of being cross collateralized.
6           A.     Yeah, we would never --
7           Q.     But you would never do a deal like that,
8           A.     No, never.
9           Q.     I understand.  But if a deal like that were
10   indeed the case, if these records were separate, more
11   money would be owing to Mr. Winans; correct?
12          A.     At this point.
13          Q.     Yes, at that point.  And that amount would be
14   at that point $137,000.
15          A.     To BeBe according to this e-mail.
16          Q.     Yes.  Is that correct as far as you know?
17          A.     I would --
18          Q.     You have no reason to doubt it, do you?
19          A.     I have no reason other than a conversation
20   from Alex to Roger to --
21          Q.     May I have that document back, please, sir.
22          A.     I think that this -- what this is pointing to,
23   though, is not -- is a reason to terminate the
24   relationship.  It's -- what he's pointing out is how
25   unreasonable this argument is in light of what we had all

S. McKEEVER

agreed to and what the basic premise of having a joint

venture is. I don't think he's saying that, oh, let's get

out of this because of we'd have to do this otherwise. It

was, I think if you just read through this whole thing,

he's saying this is -- these are unreasonable positions to

take.

Q.    I understand.

Mr. McKeever, I'd like to also ask you to

identify this document I'm passing you.

A.    Sony -- it looks like our distribution

agreement, our original -- is this the original? -- yeah,

the original Sony distribution agreement, I guess.

Q.    The one we're referring to earlier in your

deposition; is that correct?

A.    Yes. I think we were off the record when we

were talking about this maybe.

Q.    What are the documents that are separate to

this agreement? I see there's an attachment to it that's

a separate document itself. Would you identify that.

A.    This is a Hidden Beach extension and loan

agreement.

Q.    Any other documents?

A.    Extension and modification. And extension and

modification.

1                              S. McKEEVER

2          Q.     As far as you believe or understand, those are

3     accurate copies or those are complete copies --

4          A.     I have no reason to think otherwise.

5          Q.     Of the Sony distribution agreement; is that

6     correct?

7          A.     No reason to think otherwise.

8          MR. CHESSER:  Could we label those as an exhibit,

9     please.

10              (Exhibit 5 marked for identification.)

11         MR. PHILLIPS:  Is that a cumulative exhibit?

12         MR. CHESSER:  Yes, it is.

13         Q.     Mr. McKeever, I have only recently received

14    these documents.  As you understand, I have not had a

15    chance to really peruse them.  They're fairly lengthy and

16    complex, so I may reserve the right to ask questions

17    through other discovery processes regarding these

18    documents that we just received this morning.

19              But for the time being, there are no other

20    agreements dealing with Sony Distribution that you know

21    of, are there?

22         A.     Not that I know of.  No.

23         Q.     Was a video made for the "Dream" album?

24         A.     Not a music video.

25         Q.     What type of video was made?

1          S. McKEEVER

2      A.      An EPK, an Electronic Press Kit, like an

3  interview with BeBe talking about the record, things like

4  that.

5      Q.      Was it sold or just used promotionally?

6      A.      I think on the first -- the limited edition

7  version of the album had this interview footage with BeBe.

8  We used the thing that we normally gave promotionally out.

9  It was sort of a bonus piece.

10     Q.      Do you know how much that piece cost to

11 produce?

12     A.      I can't remember.

13     Q.      Who decided to produce it?

14     A.      We did, I'm pretty sure.

15     Q.      "We" meaning Hidden Beach?

16     A.      Hidden Beach and I think it was either Michael

17 Ammons or one of BeBe's -- I think it was -- I think that

18 may have come from Michael Ammons, one of BeBe's

19 associates, who was a film guy who was around.

20     Q.      In your distribution agreement, referring to

21 that with Sony, did you authorize Sony to use Mr. Hemby's

22 name in connection with the release of "Dream" or "My

23 Christmas Prayer"?

24     A.      Did we authorize it to use it?

25     Q.      Yes.

1                        S. McKEEVER

2        A.      I guess if we submitted, you know, the

3    credits.  You know, you're talking about just on the

4    credits itself?

5        Q.      I'm asking did you authorize the use of the

6    name for purposes of exploitation or marketing of the

7    records?

8        A.       It was never to my knowledge never used as a

9    marketing piece.

10       Q.       That's not my question, though.  My question

11   is:  Did Hidden Beach authorize --

12       A.       I probably -- probably in those --

13       MR. CHESSER:  Would you let me finish?

14             Would you read the question back, please.

15             (The record was read.)

16       A.       My assumption is that Sony would have the

17   right --

18       Q.       Excuse me, Mr. McKeever.  I'm not asking you

19   to assume or to guess.  If you don't know the answer, just

20   say "I don't know."

21       A.       I don't know.

22       Q.       Do you know how many units of the "Dream"

23   album were manufactured?

24       A.       I think it was like 100,000 or so.

25       Q.       How about the "Christmas" album?  How many

Case 3:06-cv-00979   Document 106   Filed 07/16/09   Page 123 of 135 PageID #: 945

S. McKEEVER

1

2  were manufactured there?

3      A.      Initially probably maybe 80 on "Dream."  And I

4  may have just gotten confused by looking at that e-mail.

5  I think initially on the "Christmas" it was 80 and 60 came

6  back or 180 came back.  And then we did the second year it

7  was like we did like 220 or 240.

8      Q.      240 for --

9      A.      For "Christmas."

10     Q.      In total, cumulatively, do you know how many

11  albums or units would have been manufactured for "Dream"

12  -- I mean, excuse me, for "Christmas Prayer"?

13     A.      No, because there was a manufacturing snafu on

14  the first one.

15     Q.      What was the snafu you're referring to?

16     A.      Sony manufactured "Christmas" albums that were

17  defective.

18     Q.      In what way?

19     A.      They put two different labels on top of each

20  other.  The CD was fine, but the labeling was done

21  incorrectly.

22     Q.      And what happened to those defective albums?

23     A.      I don't know.  We've been told -- we've been

24  playing with that.  I don't know if they still are sitting

25  in a warehouse or they got destroyed.  The cost to fix

1          S. McKEEVER

2    them was -- because they would have to be fixed by hand,

3    taken out of the package, put the correct CD, I think was

4    said to be more than the process.

5          And I had -- so I know we tried giving them

6    away to the troops, which I think the Iraq war had just

7    started or something, and to give it -- you know, we were

8    trying to find charities. Because I hated the idea of

9    them -- because the message on the record "My Christmas

10   Prayer" was written about the tough times the Armed

11   Services people were going to have that Christmas was the

12   inspiration. So we were trying to find some way to, you

13   know, charitably, you know, pass that message around.

14        Q.    Who absorbed the cost of this snafu, as you

15   called it?

16        A.    I don't remember. I know we were upset with

17   Sony at the time for the mistake.

18        Q.    Did Hidden Beach pay for it ultimately the

19   mistake?

20        A.    We may have at some -- to some -- I don't know

21   if it ended into a separate deal with it. Because they

22   were -- Sony's argument was they were rushing to try to

23   fulfill what they thought was going to be a potential

24   demand for him showing up on Oprah. That demand wasn't

25   realized, but they tried to -- they did their best to, you

1          S. McKEEVER

2     know, sort of break their rules as far as how long it

3     takes to manufacture and do something.  And in breaking

4     their rules of their normal chain, that's how the mistake

5     happened.

6          Q.     How many units would that account for, that

7     initial defective run, roughly?

8          A.     It was pretty much all the records in that

9     first run.

10         Q.     And how much would that have been?

11         A.     I don't remember.

12         Q.     More than 50,000?

13         A.     I think so.

14         Q.     Less than 100,000?

15         A.     It may have been around 100.  It may have been

16    around that much.

17         Q.     Who would know that information?

18         A.     Alex could find it out.

19         Q.     And when you say Alex, you mean --

20         A.     Alex Kesicbasian.

21         Q.     -- your CFO.

22         A.     Right.

23         Q.     We're almost done.

24                What territories were the albums distributed

25    in?

S. McKEEVER

1

2     A.     US.  I don't know.  I think it may have just

3  been -- because I was very surprised.  I went overseas

4  pitching the "Christmas" album and found out really for

5  the first time that Christmas albums even in the UK,

6  which, you know, a lot of similar traditions aren't --

7  weren't big sellers.  And people as much as they were

8  moved by it weren't very interested.  So I'm not sure if

9  it came out anywhere besides the US.

10     Q.     Was there any distribution through Integrity

11  or Sony in, say, Australia or New Zealand?

12     A.     I don't know.

13     Q.     To the best of your knowledge, you don't know?

14     A.     I don't know.

15     Q.     There could have been; you just don't know?

16     A.     Yeah.

17     Q.     And as well as Europe.  It could have been

18  distributed there?  You don't know?

19     A.     I'm pretty sure it didn't, but I don't

20  remember.

21     Q.     Who would know that again?

22     A.     Alex would be able to find it out for you.

23     Q.     And were there uses of the individual

24  recordings on the album that were marketed as well, like

25  in "Dream" or "Christmas Prayer" were certain selections

1           S. McKEEVER

2    of the album licensed out for other projects, compilations

3    or otherwise?

4           A.     I don't remember.

5           Q.     Are you familiar with the "Passion" album, the

6    Mel Gibson soundtrack album?

7           A.     Oh, yeah.  I'm familiar -- you mentioned

8    earlier, but I don't remember anything -- you mentioned

9    there was a track from that or something on our album.

10          Q.     Do you know whether or not there was a

11   track --

12          A.     I don't remember.

13          Q.     -- from "Dream" used on that album?

14          A.     Oh, no, I didn't -- if --

15          Q.     If I showed you the album, would that refresh

16   your recollection?

17          A.     Yeah.

18          Q.     "Miracle of Love," have you heard of that

19   track?

20          A.     Yes, but I don't know if that was on our

21   record.  I may have just forgotten it, actually.

22          Q.     My point is that that "Miracle of Love," if it

23   were on the "Passion," would have been licensed for use on

24   the "Passion" through you, I take it; is that correct?

25          A.     If that was one of our records, and it was pre

1                    S. McKEEVER

2      -- I mean post our deal, we would have licensed it for,

3      but I just don't remember that at all.

4           Q.     Let me just refresh your recollection here

5      quickly.  Have you seen that album before?

6           A.     Never.  At least not to my -- this doesn't

7      even ring --

8           Q.     Would you identify the exhibit marker on that

9      piece of paper.

10          A.     Winans 55?  Or Winans 5.

11          Q.     That's an exhibit from a former deposition

12     that Plaintiff took of Bebe Winans.  You've not seen that

13     album cover before?

14          A.     No.

15          Q.     So you would have no knowledge of anybody at

16     Hidden Beach authorizing the use of a track on that album?

17          A.     I just don't remember.

18          Q.     All right.  It wouldn't surprise you, though,

19     to learn that other uses for the masters have been made

20     from the "Dream" and the "My Christmas Prayer" albums;

21     that there have been master use licenses.  Would that

22     surprise you?

23          A.     That I wouldn't -- you mean unless it was just

24     -- we had granted Sony pretty much carte blanche, you

25     know, compilation things, especially like -- it may have

1          S. McKEEVER

2    been some European compilation or something like that.  I

3    just don't remember any of that.

4          Q.    All right.  And does currently does Mr. Winans

5    claim that Hidden Beach owes him any money?

6          A.    Not to my knowledge.

7          Q.    Who would know that?

8          A.    Alex I guess would know that as well, but my

9    knowledge I don't think there's anything --

10         Q.    Other than the indemnity agreement, Hidden

11   Beach has no claims against Mr. Winans; is that correct?

12         A.    Not that we know of.

13         Q.    Finally, Mr. McKeever, did you understand all

14   my questions today?

15         A.    I think so.

16         Q.    And did you reveal all the facts known to you

17   to the best of your knowledge in response to these

18   questions?

19         A.    Yes.

20         Q.    And were the answers to these questions true

21   to the best of your belief?

22         A.    Yes.

23         MR. CHESSER:  Then I want to thank you for your time.

24         THE WITNESS:  Okay.  Thank you.

25              (The proceedings concluded at 12:35 p.m.)

C E R T I F I C A T E

STATE OF CALIFORNIA          )

                            )SS.:

COUNTY OF LOS ANGELES        )


          I, CHRISTY A. CANNARIATO, a Certified

Shorthand Reporter within and for the State

of California, do hereby certify:

          That Steven McKeever, the witness

whose deposition is hereinbefore set forth,

was duly sworn by me and that such

deposition is a true record of the

testimony given by such witness.

          I further certify that I am not

related to any of the parties to this

action by blood or marriage; and that I am

in no way interested in the outcome of this

matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 25th day of March, 2008.



_____

CHRISTY A. CANNARIATO, CSR #7954

```
1                    ERRATA SHEET FOR THE TRANSCRIPT OF:

2

3   CASE NAME: Hemby v. Winans, Hidden Beach

4   DEP. DATE: March 12, 2008

5   DEPONENT:  Steven McKeever

6

7   Pg.  Ln.   Now Reads          Should Read          Reason

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23

24                             _____

25                             Signature of Deponent
```

```
1    STATE OF CALIFORNIA    )

2                          ) SS

3    COUNTY OF LOS ANGELES )

4

5

6

7

8

9

10

11

12

13          I, the undersigned, declare under penalty of

14   perjury that I have read the foregoing transcript, and I

15   have made any corrections, additions or deletions that I

16   was desirous of making; that the foregoing is a true and

17   correct transcript of my testimony contained therein.

18          Executed this _____ day of _____, 20__, at

19   _____, _____.

20    (City)      (State)

21

22

23

24                          _____

25                               Steven McKeever
```

## Roger Patton

| | |
|---|---|
| **From:** | Roger Patton |
| **Sent:** | Tuesday, March 15, 2005 11:12 PM |
| **To:** | Steve McKeever |
| **Cc:** | Alex Kesicbasian; Roger Patton |
| **Subject:** | Talking Points Bullet Points for BeBe conversation |

Relationship letter type Bullet Points for BeBe discussion:

*   Mutual Intention to marry brands and help BeBe establish TMG and help HB launch Still Waters
*BeBe brought deep rolodex, goodwill and icon status, HB brought goodwill, relevant brand and finances to venture
* Concept was if profits earned they would be shared, financial risks borne exclusively by HB

*Initial release of Xmas album not profitable for HB **even with Oprah blessing in 2003**
* No one asked BeBe to bear increased share of losses if future projects didn't pan out because initial release of XMAS album was not successful.
* Impact of 80% return rate of XMas album reverberated across all of HB artists not just Bebe project
* Impact of direct contact with distributor caused problems across board for HB not just as it related to BeBe
*HB spent hundreds of thousands in "manpower hours" (Steve and Roger time) securing King license - a damn near unprecedented feat! and Steve traveled around country and met with uber tastemakers and powerbrokers proselytizing about the Dream song (Burrell Agency, Microsoft, Ebony, BET), regarding potential of King song and global initiatives

* Xmas album success in 2004 attributable in large part to Oprah but also in significant part to HB reaching out to Starbucks in first instance at Ken Lombard level and pre-existing good will with Howard Schultz etc.
  That it succeeded was due to both parties contributions but it is shortsighted to ignore previous risks taken and put HB at risk of loss if DREAM sales less than anticipated, a reality we have to face in light of current status of project.

*HB always treated BeBe with respect and compassion and when he was in need of cash, whether to Bail out a friend or in cash crunch we acted in BeBe's best interest and not necessarily in HB's best interests (i.e. long form still not signed when Christmas advance paid and big problems still existed regarding relationship with Distributor) Nonetheless if BeBe was in need, HB put the contract aside and addressed his needs,

(This in the face of all of the previous problems HB has had with management and previous petulant and childlike threats not to perform promotional activities unless demands are met)

* To later be accused of mistreatment and of taking advantage of BeBe is not only extremely insulting but it flies in the face of reality and turns the concept of a joint venture on its head. It is a slap in the face,
No good deed goes unpunished.

*Label has had to tolerate many affronts and disrespect and insults from BeBe's management and counsel. But we keep on turning the other cheek.

Life is too short.

BeBe seems to constantly want to have his cake and eat it too. Treat me like an artist when I need money. treat me like a business partner when convenient to me.

*BeBe's knee jerk response to being upset with an accounting statement in which the account is crossed ( a statement that even his management concedes is not out of the ordinary or unfair) is to threaten to sabotage his own project and not help promote it.

EXHIBIT
4
McKeever 3-12-08

To date BeBe has received roughly $200,000 in advances. If we did not cross the Dream album, he would have received another $137,500, per Alex.

3/16/2005